Allegaert Berger & Vogel LLP
Richard L. Crisona
1199 Route 22 East
Mountainside, New Jersey 07092
*Attorneys for Plaintiff,*
*Intelliga Communications, Inc.*

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| INTELLIGA COMMUNICATIONS, INC., |  |
| Plaintiff, | 15 CV _____ ( ) |
| -against- | **COMPLAINT** |
| FERRARI NORTH AMERICA, INC., and ICREON TECH INC., |  |
| Defendants. |  |

Plaintiff, Intelliga Communications, Inc. ("Intelliga"), by its undersigned

attorneys, states for its Complaint against Ferrari North America, Inc. ("FNA"), and iCreon Tech

Inc. ("iCreon"), upon knowledge with respect to its own acts and upon information and belief

with respect to all other matters, as follows:

1. This is an action (a) for federal copyright infringement under 17 U.S.C. § 501,

*et seq.*, breach of contract, quasi-contract, conversion, replevin and civil conspiracy against FNA

based on FNA's misuse and misappropriation of intellectual property (the "Intelliga IP" or

"Intelliga's IP"), in the form of computer programs authored by and licensed from Intelliga, and

FNA's failure to pay licensing and service fees under its agreement with Intelliga regarding the

Intelliga IP; and (b) for federal copyright infringement under 17 U.S.C. § 501, *et seq.*, quasi-

contract, conversion, replevin and civil conspiracy against iCreon based on its misuse and

misappropriation of the Intelliga IP in building a competing computer program after accessing

Intelliga's IP through and with the connivance of FNA.

2.  Since 2005, Intelliga has provided FNA with the Ferrari North America Dealer Extranet (the "Intelliga-FNA Extranet"), a password-secured digital asset management system allowing FNA and Ferrari dealers to streamline their business processes and communications by saving, retrieving, storing, organizing, and using digital materials and information with a server-based, Web-browser accessible communications platform reachable from anywhere with an internet connection, pursuant to a series of Consulting Services Agreements (each, a "CSA"), which contain a license from Intelliga to FNA allowing FNA to use the IP, subject to various restrictions on what FNA may do with the IP.  During 2014 and 2015, in violation of the CSA, FNA knowingly provided unauthorized access to Intelliga's IP to iCreon on over 1,250 occasions.  At the end of 2014, which was also the end of the 2014 CSA, FNA purported to terminate its relationship with Intelliga and replace the Intelliga-FNA Extranet with one provided by iCreon (the "iCreon Extranet") that provides a similar function for FNA.  Moreover, FNA locked Intelliga out of FNA's servers, preventing Intelliga from retrieving its IP, and has refused to turn over and to direct iCreon to turn over any IP they have in their possession.  Finally, FNA has refused to pay any portion of the $161,700 it owes in license and service fees under the 2014 CSA, plus contractual interest thereunder.

**Jurisdiction and Venue**

3.  The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1338 and 1367.  Additionally and alternatively, this Court has jurisdiction over this action under 28 U.S.C. § 1332(a)(2), (c)(1) because this is an action between a citizen of a foreign country and citizens of a state, and the amount in controversy is in excess of $75,000, exclusive of interest and costs.

4.  Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), 1400 in that all Defendants reside in this District.  Additionally and alternatively, venue is proper in the District

under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Intelliga's claim occurred, and a substantial part of the property that is the subject of the action is situated, in this District.

### The Parties

5.  Plaintiff, Intelliga, is a corporation existing and organized under the laws of the Province of Ontario, Canada, with its principal place of business in Mississauga, Ontario, Canada.  Intelliga is in the business of developing branding and marketing strategies for clients and executing them online and in print, and includes both server- and client-side web and mobile application development.

6.  Defendant FNA is a corporation existing and organized under the laws of the State of Delaware, with its principal place of business in Englewood Cliffs, New Jersey.  FNA is the importer and distributor of Ferrari-brand automobiles for North and South America.

7.  Defendant iCreon is a corporation existing and organized under the laws of the State of Delaware, with its principal place of business in Jersey City, New Jersey.  iCreon is in the information technology business, including building and servicing websites and other computer-related products and services.  Until accessing Intelliga's IP and, as a result, supplying FNA with the iCreon Extranet, upon information and belief based on a list of clients identified at the iCreon website, iCreon had no toehold in supplying extranet technology to automobile-related companies.  iCreon is now in a position to use Intelliga's IP to market itself to other automobile companies and, indeed, to any company that customizes and maintains inventory.

### Statement of Facts

**A.      The Relationship of the Parties and the History of the Intelliga IP**

8.  FNA was a client of Intelliga's for marketing services since 2000, and of Intelliga's predecessors, for a few years prior to that.

9.  FNA's parent, Ferrari SpA, also owned Maserati SpA at the time and was reintroducing Maserati to North America.  There was a great deal of operational overlap between the companies at that time.

10.  In 2003, Maserati North America, Inc. ("MNA"), contracted with Intelliga to design, build and maintain an extranet system (the "Intelliga-MNA Extranet") for MNA on Intelliga's proprietary Reservoir platform, a platform based on Microsoft Windows Server Operating System.

11.  This Intelliga IP has been licensed along with support services for over $4.5 million since Intelliga created it.  In 2013, Intelliga earned approximately $462,500 from license and related service fees (including those paid by FNA).  In 2014, Intelliga earned approximately $470,050 from license and related service fees (including those incurred but not paid by FNA).

12.  In 2005, FNA contracted Intelliga to design, build and maintain the Intelliga-FNA Extranet for FNA.  It was also based on Intelliga's proprietary Reservoir platform and was connected with the Intelliga-MNA Extranet.

13.  The Extranet is a password-secured Digital Asset Management system accessed by use of a Web browser.  The system is known as Reservoir and was initially developed and built during 2002-03.  It consists of a variety of modules united by a graphical user interface and an associated database that run on Microsoft Windows Server Operating System and the Micrsoft.NET platform.  The system is primarily designed to act as an

4

administrable, organized, searchable storage and retrieval system for virtually any form of digital file.  The system has a variety of proprietary modules best described as Web-enabled applications integrated with and running as part of Reservoir.  Among those web-enabled applications is the Car Price Calculator, which allows FNA staff and the staff of authorized Ferrari dealers who have been granted access to the Intelliga-FNA Extranet to select options on a particular Ferrari model and determine the exact cost of the car with the selected options, while managing option selections to ensure the integrity of the option choices (*e.g.*, preventing the inclusion of conflicting options, ensuring the inclusion of one or more options that may be required by the selection of a particular option, and ensuring package prices are properly calculated where a package price may differ from the sum of the individual option prices).

14. In addition to creating the Intelliga-FNA and Intelliga-MNA Extranets, Intelliga from time to time also provided related services, such as strategic marketing consulting services, technical consulting or support, managing other marketing agencies and services by helping FNA to define the agencies' roles and to develop the strategies by which they worked with Intelliga on FNA's behalf.  These services were primarily related to computer-based market research and analysis.  Intelliga had responsibility for items such as writing business rules and determining the nature of research to be conducted, on behalf of Mr. Montopoli's various assistants, who also served as the assistant project manager on the FNA-Intelliga Extranet.  Intelliga performed similar internal functions on behalf of Mr. Montopoli's subordinate who ran the Ferrari Driving Experience schools in North America, including developing and delivering surveys, and collecting responses on Intelliga's Reservoir-related software.  Intelliga originated FNA's online magazine, Rosso Online, and produced and executed everything in relation to it for two years.  Intelliga at certain times developed and maintained Web sites such as Ferrari.com –

5

the primary site of FNA (and, by virtue of having the ".com" extension, arguably the primary site for Ferrari worldwide), the website for the Ferrari Challenge private racing series on behalf of FNA, the Ferrari POWER warranty information site and FerrariEvent.com.

15.  In 2008, Intelliga also designed and deployed a major upgrade to the Reservoir Platform, improving both the Intelliga-FNA and Intelliga-MNA Extranets.

16.  The license fees for the IP and the service fees were governed by a series of Consulting Services Agreements.

17.  It was the practice of the parties to prepare a new, written CSA for each year, but usually not to sign it.  Indeed going back to at least 2009, none of the CSAs are signed by the parties.  The parties nevertheless manifested their intent to be bound to the terms of the CSA by fully performing their respective obligations under each CSA, until FNA began breaching the 2014 CSA.

18.  Attached hereto as Exhibit A is a true and correct copy of the 2014 CSA. Attached hereto as Exhibit B is a true and correct copy of the 2013 CSA.

19.  The practice was that Intelliga would invoice FNA based on the terms of that year's CSA, including adjustments for any services the parties agreed to add or delete.

20.  The total fees under each CSA would vary based on discussions between Intelliga and FNA based on what services would or would not be included under the new CSA and what prices Intelliga would charge for the license and service items.

21.  For example, Intelliga reduced the price for the 2014 CSA by $2,100.00 because FNA had not used, and seemed unlikely to use, one of those services, regarding the sending of surveys for 2014.

22.  Until the 2014 CSA, FNA paid all of the invoices sent by Intelliga.

6

23.  In late 2013, FNA's assistant project director related to the Extranet, Anupa Charles-Pierre, discussed the 2014 contract by phone with Mark R. Davidson, Intelliga's president, telling him that FNA would continue to use the Intelliga-FNA Extranet and Intelliga's services throughout 2014, and that no changes would be required so far as she then knew, but that she would advise him regarding any further information.

24.  Neither Ms. Charles-Pierre nor anyone at FNA contacted Intelliga regarding any reductions in the services to be provided under the 2014 CSA.

25.  In late October 2014, R.A.V. Fox, the managing member of Intelliga Communications LLC ("Intelliga USA"), a subcontractor of Intelliga, contacted Paul Montopoli regarding the 2014 CSA and payment.  Since 2005, Mr. Montopoli was the FNA project director for the Intelliga-FNA Extranet, and is designated as the "notice" person on the 2013 and 2014 CSAs.

26.  Mr. Montopoli informed Dr. Fox that the Extranet was no longer within his remit or his Marketing Department's remit, and it had been transferred to the Information Technology ("IT") Department, specifically to Sandro Levati, Director of IT.

27.  During the last week of October 2014, Mr. Levati contacted Dr. Fox by phone and orally informed him that FNA did not intend to use the Intelliga-FNA Extranet after December 31, 2014.

**B.**   **FNA's Failure to Pay Amounts Owed Under the 2014 CSA**

28.  On October 21, 2014, Mr. Levati spoke by phone with Dr. Fox and mentioned there was an issue regarding a "security audit" performed by an outside firm in 2013, but Mr. Levati said it was in the past, that he did not consider it to be worth raising, as Intelliga

was not going to be FNA's provider anymore and that it did not bear on the services Intelliga provided in 2014

29. In November 2014, Mr. Levati indicated that Mr. Montopoli might be claiming some sort of disagreement with regard to the 2014 services Intelliga had performed. However, during the rest of 2014, there was materially no follow-up by FNA, nor any other communication about FNA disagreeing with the services Intelliga performed or explaining what that disagreement might be.

30. On December 1, 2014, Intelliga invoiced FNA for the 2014 CSA in the amount of $161,700.

31. On December 12, 2014, Mr. Levati requested separate invoices for the license fees ($51,000) and service fees ($110,700), indicating that he would seek payment for the license immediately while awaiting discussion of the services.

32. On December 15, 2014, Intelliga provided the revised (split) invoices for 2014 to Mr. Levati.

33. Section 3(c)(i) of the 2014 and 2013 CSAs provides that FNA must make payments within 30 days of invoicing, "unless such amounts are disputed in writing by FNA with applicable support therefor within 15 days of receipt of such invoice."

34. FNA has provided no written disputation of either of the split 2014 Intelliga invoices identifying specific items of dispute.

35. FNA has paid no portion of either of the 2014 split Intelliga invoices.

36. It was not until some time after February 18, 2015, when Intelliga's counsel sent demand letters to FNA and iCreon that FNA explained what the "disagreement" was -- the "security audit" issues dismissed as immaterial by Mr. Levati in October 2014.

8

37. The "security audit" issues, as claimed by FNA, are as follows:  On October 31, 2013, FNA had sent Intelliga a list of items raised by the "security audit."  On November 19, 2013, Intelliga responded in writing to the list of items.  Most were the responsibility of FNA's IT Department, as they did not pertain to the Intelliga-FNA Extranet. Several pertained to the Intelliga-MNA Extranet (and MNA had never voiced any concern to Intelliga and has paid all of its invoices, including those for 2013 and 2014).  Several were not security issues at all, but outdated pages that could be removed, but were causing no harm or risk.

38. Intelliga cannot confirm to what extent it completed the minor work related to the Intelliga-FNA Extranet because by the time FNA explicated what the issue was in 2015, it had blocked Intelliga's access to Intelliga's own IP.

39. Moreover, any work in response to the "security audit" items would have been optional Schedule A work, which Intelliga was not contractually required to perform, either pursuant to the 2013 CSA or the 2014 CSA.  FNA paid all invoiced amounts under the 2013 CSA.

40. Finally, FNA was never invoiced for any work related to the "security audit" items.  Whatever was done by Intelliga, was done gratis as a favor to a long-time client.

41. In other words, FNA is refusing to pay Intelliga's 2014 invoice based on optional work Intelliga may or may not have done under the 2013 CSA, and for which FNA was not charged.

C.  **Intelliga's Discovery of FNA's and iCreon's**
    **Infringement of Intelliga's Copyright in the Intelliga IP**

42.  On November 12, 2014, Mr. Levati requested an estimate for Intelliga to perform a data export from the Intelliga-FNA Extranet so that the new developer – which Intelliga later identified as iCreon – could transfer it to the iCreon Extranet.

43.  The export would "result in the export of files and associated meta data (the latter as individual text files) onto the FNA server from the Reservoir Database," as Dr. Fox wrote to Mr. Levati on December 1, 2015,

44.  This kind of request is for extra work, which is governed by Schedule A of the 2014 CSA.

45.  Under Schedule A, Intelliga has no obligation to undertake such extra work. Nonetheless, on December 1, 2014, Intelliga provided an estimate of $6,500 for this work (noting that it would be governed by the 2014 CSA), which FNA accepted on December 4. Intelliga made the data transfer on December 11, and FNA paid Intelliga the $6,500.

46.  On December 30, 2014, Intelliga discovered it no longer had administrative access via "Remote Desktop" control to the server on which the Intelliga-FNA Extranet exists. The last date on which Intelliga had accessed the server using Remote Desktop was on or about December 11, 2014, the day on which Intelliga provided FNA with the requested data transfer.

47.  Intelliga informed Mr. Levati of the inability to access the server on December 31.

48.  Approximately one hour later, Mr. Levati responded by e-mail, indicating that FNA would investigate remotely (as both he and a particular staff member were away from the office), possibly on January 5, 2015.

49.  Despite repeated inquiries from Intelliga (both e-mails and phone calls), no further response to this request was ever received from FNA, and access was never restored.

50.  By blocking administrative access to its server, FNA is denying Intelliga access to and repossession of Intelliga's IP.

51.  Notwithstanding the termination of the CSA on December 31, 2014, FNA continued to use the Intelliga-FNA Extranet in 2015 and has not returned Intelliga's IP.

52.  Logs indicate that approximately 200 FNA/Dealership users logged into and used the Extranet during the first week of January 2015 alone.

53.  An exact figure through the filing of this Verified Complaint cannot be provided because FNA is preventing Intelliga from having any access to the Intelliga IP on the FNA server.

54.  On January 5, 2015, Mr. Levati requested an extension of licensed access to the Intelliga-FNA Extranet for January 2015, indicating FNA would pay for license fees from his department's budget.

55.  Also on January 5, 2015, Mr. Levati advised Dr. Fox by e-mail, with a cc to iCreon, of an apparent anomaly between Car Price Calculator application data supposedly exported by Intelliga on December 11, 2014, for use in the replacement extranet, and what could be seen on the Intelliga-FNA Extranet.

56.  Upon information and belief, Intelliga did not export such data as part of the December 11 export.  No Car Price Calculator data should have been exported under the terms of the CSA because they are materials from an application integrated with the Intelliga-FNA Extranet.  The Car Price Calculator is not a readable content file (such as a file with a .pdf or .xls suffix), but rather an application that is housed within the Intelliga-FNA Extranet and not a

11

digital file that can be read and understood by somebody other than a computer programmer. The interactive nature of the application would be obvious to an IT professional.

57. The only data subject to export would have been FNA's proprietary content regarding its automobiles that is stored on and manipulated with the Intelliga-FNA Extranet.

58. Mr. Levati's statement implies that the other developer (which Intelliga later learned was iCreon) had access to the Intelliga-FNA Extranet and that data had been exported that related to the Car Price Calculator application designed, developed, and administered by Intelliga as part of the Intelliga-FNA Extranet.

59. Had the data export been limited to FNA's proprietary data, Mr. Levati's assertion of a discrepancy would make no sense because FNA had copies of its own data in .pdf and .xls forms, which is how FNA had provided that data to Intelliga in the first place.

60. Moreover, unless the iCreon Car Price Calculator substantially replicated the Intelliga IP, importing the Ferrari proprietary data would not have been materially easier than simply uploading it manually from FNA's .pdf and .xls files, and indeed could have been more difficult.

61. Upon discovering this information, it became apparent to Intelliga that FNA was sharing Intelliga IP with iCreon.

62. Based on the suspicious information Mr. Levati provided the day before, on January 6, 2015, Intelliga conducted a review of Mr. Levati's user logs for the Intelliga-FNA Extranet.

63. The logs show that Mr. Levati's account was used from Internet Protocol Addresses located in India.

64. Mr. Levati works in New Jersey.

65.  The logs showed that beginning on July 4, 2014, though January 7, 2015, there had been over 1,250 incursions into the Intelliga-FNA Extranet from the Indian addresses.

66.  Each incursion represents a specific item within the Intelliga-FNA Extranet that was viewed by the person using the log in.  The logins themselves occurred or more times a week over a six-month period, indicating that the users were slowly reviewing large sections of the Intelliga-FNA Extranet.

67.  The log columns titled "Log_Category" and "Log_Source" demonstrate the kind of activity in which the Indian users engaged.  In Log_Category, "DAM" refers to the Reservoir-based system component of the Intelliga IP.  "Snap-in" in Log_Category refers to something Intelliga specifically created for FNA.

68.  In the Log_Source column, "View Node" refers to the viewing of an index of files, while "View Asset" refers to reading a specific file.  "Download" in that column means that the user actually copied the file he or she was looking at to his or her own computer.

69.  Intelliga is informed and believes that the persons accessing the Intelliga-FNA Extranet from the Indian addresses were working directly or indirectly for iCreon.

70.  Allowing a third party access to the Intelliga-FNA Extranet without Intelliga's written permission is a breach of the CSA, sections 3(c)(ii), 5(b) and 5(c).

71.  Upon learning of these incursions from India through Mr. Levati's account, Dr. Fox asked Mr. Levati on January 6, 2015, if he knew who was doing so.  Mr. Levati indicated by e-mail that he was aware of the incursions and that it was "OK" since "they" were comparing the old and new extranets.

72.  Upon information and belief, iCreon, in creating the iCreon Extranet, copied, reverse-engineered and/or modified Intelliga's IP with FNA's complicity.

13

73.  As a result, upon information and belief, iCreon is now in a position to compete with Intelliga by providing extranet technology based on Intelliga IP to other automobile companies, and indeed, to any company that maintains and customizes inventory.

## FIRST CLAIM FOR RELIEF
### (Copyright Infringement against both Defendants)

74.  Intelliga reincorporates and re-alleges paragraphs 1 through 73 above as if fully set forth herein.

75.  The IP is a foreign work created in Ontario, Canada, by Intelliga.

76.  The iCreon Extranet was created and is being operated by FNA and iCreon based on the copying of Intelliga's IP.  FNA was permitted to have access to the IP only for the duration of the CSAs, which it terminated effective December 31, 2014, and it was never permitted to give iCreon access to that IP.  iCreon was never permitted to have access to the IP. The operation of the iCreon Extranet appears to have necessarily involved the copying and use of the IP.  Therefore, FNA's and iCreon's continued copying and use of the IP is an unauthorized copyright violation.

77.  FNA's infringement of Intelliga's copyright is willful.

78.  Intelliga has informed iCreon that iCreon has infringed on Intelliga's copyright.

79.  iCreon has refused to deny so infringing, or to cease and desist from continuing that infringement.

80.  iCreon's infringement of Intelliga's copyright thus is willful.

81.  Intelliga has been and is being damaged and irreparably harmed by the Defendants' infringement of its copyright.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract against FNA)

82.  Intelliga incorporates and re-alleges paragraphs 74 through 81 above as if fully set forth herein.

83.  The 2013 and 2014 CSAs were valid contracts between Intelliga and FNA.

84.  Intelliga fulfilled all of its obligations under the 2013 and 2014 CSAs by providing FNA with the license and services described in those CSAs.

85.  By permitting iCreon to access the Intelliga-FNA Extranet without Intelliga's written permission, FNA breached the 2013 and/or 2014 CSAs.

86.  These breaches of the 2013 and/or 2014 CSAs by FNA have damaged Intelliga in an amount to be proved at trial.

## THIRD CLAIM FOR RELIEF
### (Breach of Contract against FNA)

87.  Intelliga incorporates and re-alleges paragraphs 82 through 86 above as if fully set forth herein.

88.  The 2014 CSA was a valid contract between Intelliga and FNA.

89.  Intelliga fully performed its obligations under the 2014 CSA by providing FNA with the license to the Intelliga IP and the services described in the 2014 CSA.

90.  FNA has breached the 2014 CSA by failing to pay Intelliga as it contracted to do under the 2014 CSA.

91.  Intelliga has been damaged in an amount to be determined at trial, but not less than $161,700, plus contractual interest under the 2014 CSA at a rate of one percent (1%) per month, as a result of FNA's breach.

## FOURTH CLAIM FOR RELIEF
### (Action on Account against FNA)

92.  Intelliga reincorporates and re-alleges paragraphs 87 through 91 above as if fully set forth herein.

93.  Intelliga's performance as described in the 2014 CSA gave rise to a creditor-debtor relationship between it and FNA.

94.  In exchange for the license and services Intelliga provided, FNA promised to pay the fees Intelliga charged under the 2014 CSA.

95.  On December 31, 2014, the 2014 CSA terminated, and Intelliga completed its performance thereunder.

96.  The balance due to Intelliga from FNA on the account is the invoiced amount, $161,700 plus one percent (1%) interest per month after December 31, 2014.

97.  Intelliga made demand for this payment in a February 18, 2015 letter from its counsel to FNA.

98.  FNA has not paid anything on its account for 2014 with Intelliga.

99.  Intelliga has been damaged by FNA's failure to pay its account in the amount of $161,700 plus one percent (1%) interest per month after December 31, 2014.

## FIFTH CLAIM FOR RELIEF
### (Quasi-Contract against FNA)

100.  Intelliga reincorporates and re-alleges paragraphs 92 through 99 above as if fully set forth herein.

101.  Alternatively, FNA has been unjustly enriched at Intelliga's expense by FNA's non-payment for its use of the IP and the services provided to FNA by Intelliga.

102. FNA has been unjustly enriched and Intelliga has been damaged thereby in an amount to be determined at trial, but not less than $161,700, plus interest at a rate of one percent (1%) per month.

## SIXTH CLAIM FOR RELIEF
### (Quasi-Contract against iCreon)

103. Intelliga reincorporates and re-alleges paragraphs 100 through 102 above as if fully set forth herein.

104. iCreon has been unjustly enriched at Intelliga's expense by iCreon's copying, reverse engineering and/or modification of Intelliga's IP.

105. iCreon has been unjustly enriched and Intelliga has been damaged thereby in an amount to be determined at trial, plus interest at a rate of one percent (1%) per month.

## SEVENTH CLAIM FOR RELIEF
### (Conversion against iCreon)

106. Intelliga reincorporates and re-alleges paragraphs 103 through 105 above as if fully set forth herein.

107. iCreon took or exercised unauthorized dominion and control over Intelliga IP, commencing no later than July 4, 2014.

108. Intelliga made demand for return of the Intelliga IP in a February 18, 2015 letter from its counsel to iCreon.

109. iCreon has not complied with that demand and continues to possess or exercise control over Intelliga IP.

110. Because of iCreon's ongoing, unlawful conversion of Intelliga's IP, Intelliga is being damaged in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF
### (Conversion against FNA)

111.  Intelliga reincorporates and re-alleges paragraphs 106 through 110 above as if fully set forth herein.

112.  FNA's right to possess any Intelliga IP expired on December 31, 2014.

113.  Intelliga made demand for return of the Intelliga IP in a February 18, 2015 letter from its counsel to iCreon.

114.  FNA has not complied with that demand and continues to possess or exercise control over Intelliga IP.

115.  Because of FNA's ongoing, unlawful conversion of Intelliga's IP, Intelliga is being damaged in an amount to be determined at trial.

## NINTHCLAIM FOR RELIEF
### (Replevin against both Defendants)

116.  Intelliga incorporates and re-alleges paragraphs 111 through 115 above as if fully set forth herein.

117.  FNA's license to possess the Intelliga IP expired on December 31, 2014.

118.  iCreon never had Intelliga's permission to possess Intelliga IP.

119.  On February 18, 2015, Intelliga, by its counsel, demanded that both FNA and iCreon turn over the Intelliga IP they wrongfully possess.

120.  Defendants have refused to comply with that demand.

121.  Upon information and belief, Defendants continue to possess Intelliga IP to which they have no right of possession.

122.  Pursuant to N.J. Stat. Ann. 2B:50-1, Intelliga is entitled to an order directing Defendants to return the Intelliga IP to Intelliga and for damages Defendants caused by their wrongful distraint of the Intelliga IP.

## TENTH CLAIM FOR RELIEF
### (Civil Conspiracy against both Defendants)

123.  Intelliga reincorporates and re-alleges paragraphs 116 through 122 above as if fully set forth herein.

124.  FNA and iCreon combined to make a real agreement with a common design, to wit, to unlawfully possess and use Intelliga IP.

125.  FNA and iCreon knew and agreed that FNA would provide iCreon with unlawful access to Intelliga IP, which iCreon (and eventually FNA, too) would convert and use to their own profit and to Intelliga's detriment.

126.  FNA and iCreon engaged in more than 1,250 overt acts in furtherance of this conspiracy when FNA (in the person of Mr. Levati) permitted iCreon (or persons working at its direction) with access to Mr. Levati's account on the Intelliga-FNA Extranet so that iCreon could convert the Intelliga IP to Defendants' own profit.

127.  Intelliga has been damaged by this conspiracy between FNA and iCreon in an amount to be proven at trial.

**WHEREFORE**, Intelliga Communications, Inc. demands entry of a judgment against Ferrari North America, Inc., and iCreon Tech Inc. as follows:

(a) declaring that FNA's and iCreon's unauthorized conduct violates Intelliga's rights under the Federal Copyright Act;

(b) enjoining FNA and iCreon, and their respective officers, directors, agents, servants, employees, representatives, attorneys, related companies, successors, assigns, and all others in active concert or participation with them from copying, using or republishing any of Intelliga's copyrighted material without consent or otherwise infringing on Intelliga's copyright or other rights in any manner, including without limitation, providing access to Intelliga's IP, including without limitation, the Intelliga-FNA Extranet and iCreon Extranet, in each case wherever stored, to the Ferrari dealerships in North, South and Central America;

(c) ordering Defendants to return all copies of Intelliga's IP;

(d) ordering iCreon to account to Intelliga for all gains, profits, and advantages derived by it by its infringement of Intelliga's copyright or such damages as are proper;

(e) awarding Intelliga actual and/or statutory damages for FNA's and iCreon's copyright infringement in an amount to be determined at trial;

(f) awarding Intelliga damages in an amount to be determined at trial, but not less than $161,700 plus contractual interest at a rate of one percent (1%) per month from January 1, 2015, to the date of Judgment for FNA's breach of contract and/or unjust enrichment regarding the fees for 2014;

(g) awarding Intelliga damages in an amount to be proved at trial for FNA's breach of sections 3(c)(ii), 5(b) and 5(c) of the 2013 and 2014 CSAs by providing access to iCreon to the Intelliga-FNA Extranet;

(h) awarding Intelliga damages in an amount to be proved at trial for iCreon's unjust enrichment through its copying, reverse engineering and/or modification of Intelliga's IP;

(i) awarding Intelliga damages in an amount to be determined at trial for iCreon's conversion and FNA's aiding and abetting of iCreon's conversion of the IP;

20

(j) awarding Intelliga its costs, reasonable attorneys' fees, and disbursements in this action; and

(k) awarding Intelliga such other and further relief as is just and proper.

Dated: New York, New York
        April 1, 2015

                              ALLEGAERT BERGER & VOGEL LLP


                              _____/s Richard L. Crisona_____
                              Richard L. Crisona
                                  1199 Route 22 East
                                  Mountainside, New Jersey 07092
                                  Tel. 908-228-8500
                                  rcrisona@abv.com
                              *Attorneys for Plaintiff,*
                              *Intelliga Communications, Inc.*

Of counsel:
Robert E. Malchman
Allegaert Berger & Vogel LLP
111 Broadway, 20th Floor
New York, New York 10006
Tel. 212-571-0550
rmalchman@abv.com

EXHIBIT A

# Consulting Services Agreement

THIS CONSULTING SERVICES AGREEMENT (this "Agreement") dated as of the 1st day of January, 2014 by and between Ferrari North America, Inc. ("FNA") a Delaware corporation and Intelliga Communications, Inc. (together with its authorized subcontractors, "Intelliga") an Ontario corporation.

## *Recitals*

WHEREAS, FNA wishes to retain Intelliga to provide services (collectively, the "Services") on the terms and conditions hereinafter set forth including, without limitation, a) proprietary software known as Reservoir, being a unique combination of proprietary and publicly available code designed to run on the Microsoft Windows operating system as a secure and expandable digital asset management system and associated snap-ins accessible via networked computers (the "Ferrari Dealer Extranet"), b) text, design, and imagery for use online or offline created *sui generis* or through substantial modification for the use of FNA at its behest, including but not limited to reference and educational materials such as product knowledge brochures or marketing materials such as strategic brand documents and sales and marketing collateral ("Original Content"), and c) sales, marketing and branding advice, each of such Services shall be as more fully described on schedules executed by the Parties hereto and appended to this Agreement from time to time.

Whereas, Intelliga represents that it possesses the skill and expertise to perform the Services, and that it wishes to provide Services to FNA on the terms and conditions set forth herein.

NOW THEREFORE in consideration of the premises, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## 1. Services to be Provided

(a) Intelliga agrees to provide FNA the Services.

(b) Intelliga agrees and undertakes to perform the Services in a timely fashion with all due skill, competence and diligence.

(c) Intelliga agrees that FNA shall have, at reasonable times, access to the work product, or any component thereof, which Intelliga produces in performing the Services.

## 2. Compensation

FNA shall pay Intelliga for the Services in accordance with the terms set out in Schedules as may be executed from time to time and appended hereto, which Schedules shall be deemed to be an integral part hereof as though set forth in full herein. Intelliga may, at its option, charge interest on overdue amounts at the rate of 1.0% per month from the date such amounts were first due hereunder.

## 3. Term and Termination

(a) This Agreement shall be effective from January 1, 2014 for a one year term unless earlier terminated in accordance with the provisions hereof and shall terminate without cause and without need for any notice on December 31, 2014; provided that (i) obligations that by their terms extend beyond December 31, 2014 (e.g. confidentiality, no reverse engineering, etc.) shall continue as provided herein and (ii) any payment obligations under the Agreement or any other agreement between the Parties not theretofore paid by FNA, shall be due and payable December 31, 2014, and interest rates applicable thereto shall remain in force and effect from December 31, 2014. The Parties may wish to negotiate a new agreement in respect of subsequent periods upon such terms as the Parties may agree.

(b) This Agreement may be terminated by FNA upon notice to Intelliga solely upon the occurrence of an event of default by Intelliga. Each of the following constitutes an event of default by Intelliga for the purposes of this Agreement, if Intelliga or its employees (or subcontractors):

(i) commits any material dishonest or fraudulent act in the performance of any of his or her obligations hereunder or any material misrepresentation hereunder; or

(ii) persistently fails to perform the Services as required hereunder; or

(iii) otherwise fails to perform or comply with any material term, condition or covenant of this Agreement, after notice and reasonable opportunity to cure.

(c) This Agreement may be terminated by Intelliga upon notice to FNA upon the occurrence of an event of default. Each of the following constitutes an event of default by FNA for the purposes of this Agreement, if:

(i) FNA fails to make payments for the Services for 30 days or more after the due date therefor reflected in the Schedules hereto, or, for Services for which a payment schedule is not reflected in the Schedules hereto, within 30 days of invoice therefor, unless such amounts are disputed in writing by FNA with applicable support therefor within 15 days of receipt of such invoice;

   (ii)  FNA, its Affiliates, the authorized Ferrari dealers in North, South or Central America, or any of their respective employees, officers or directors:

1. commits any material dishonest or fraudulent act which affects the Ferrari Dealer Extranet or adversely reflects on, or affects, Intelliga or Intelliga's reputation or

2. otherwise fails to perform or comply with any material term, condition or covenant of this Agreement, after notice and reasonable opportunity to cure, or

3. allows access to the Ferrari Dealer Extranet other than as permitted pursuant to this Agreement; or

4. allows misappropriation of any of Intelliga's Intellectual Property by any employee, officer or third party;

   (iii)  FNA elects to reduce the Services provided under the various Schedules hereto, so that the monthly amounts billable thereunder are reduced below 80% of the aggregate amount billable under the schedules of the contract between the Parties for December 2013.

(d) Upon termination of this Agreement, Intelliga shall be entitled to retain all fees previously received and to receive fees that have accrued but are unpaid. Intelliga shall not be entitled to any further fees under this Agreement, except reimbursement of expenses in accordance with Schedule A hereto. Intelliga shall forthwith upon termination of this Agreement and request therefor by FNA return to FNA all confidential data of FNA embodied or recorded in tangible form which is in Intelliga's possession.

## 4. Confidentiality

(a) Intelliga will not, without FNA's prior written permission, disclose to anyone outside of FNA or its Affiliates or use for other than FNA or its Affiliates, during the term of this Agreement or thereafter, any Confidential Information or Material of FNA, or any information, material received in confidence from third parties by FNA or its Affiliates, or material provided to Intelliga by third parties at the behest of FNA or its Affiliates. Upon termination of this Agreement, and request therefor by FNA, Intelliga will return all FNA property in its possession, including all Confidential Information or Material such as drawings, notebooks, reports, and other documents.

(b) Intelliga will not disclose to FNA, use in FNA's business, or cause FNA to use, any information or material which is confidential to others in the absence of permission to do so.

## 5. Copyright and Ownership

(a) Intelliga shall have all proprietary interests, including Intellectual Property interests, in everything that Intelliga and its employees and subcontractors, alone or with others, create or substantially modify for FNA including inventions, computer programs (and related documentation and materials), and Works of Authorship (which are collectively referred to herein as "Developments"). Without limitation, all working papers, notes and memoranda which are obtained by Intelliga from FNA, in the course of this Agreement shall be property of FNA and will accordingly be provided to FNA upon termination of this Agreement and request therefor.

(b) During the term of this Agreement, Intelliga shall provide FNA with annual runtime licenses allowing the Ferrari Dealer Extranet to be available for any FNA employees and authorized Ferrari dealers in North, South and Central America on any workstation or computer within property owned, leased or rented by FNA or any of the authorized Ferrari dealers in North America and Central and South America. During the term of this Agreement and thereafter, FNA agrees that it will not, and will cause its employees, officers, directors and the employees, officers, and directors of the authorized Ferrari dealers in North America and Central and South America to not attempt to copy, emulate or reverse engineer the Ferrari Dealer Extranet or any part thereof or otherwise modify or develop the Ferrari Dealer Extranet or any part thereof and/or market to any third party any digital asset management system. Nor shall FNA, during the term of this Agreement or thereafter, without the prior written consent of Intelliga, transfer to any third party or suffer to be transferred to any third party the Ferrari Dealer Extranet or any part thereof or allow access thereto for any purpose. FNA acknowledges that any such transfer or attempted transfer by FNA of the Ferrari Dealer Extranet or access thereto by any third party without prior written consent of Intelliga is a breach of this Agreement and of the applicable license and may result in immediate termination of all access to the Ferrari Dealer Extranet and any other software systems (including without limitation, "snap-ins") based upon, linked with, or accessed through Intelliga's Reservoir software.

(c) Intelliga hereby grants to FNA and the authorized Ferrari dealers in North, South and Central America a non-transferable, limited license to use all Original Content included in the Ferrari Dealer Extranet upon the following terms: During the term of this Agreement and for a period of one year thereafter, FNA may distribute such Original Content free of charge to its employees, officers, and directors and authorized Ferrari dealers in North America and Central and South America and their respective customers and potential customers, provided that such persons acknowledge that they have no rights, without the prior written consent of FNA and Intelliga, to further distribute, redevelop or otherwise exploit such Original Content. During the term of this Agreement and for a period of one year thereafter, without prior written consent of Intelliga, FNA agrees that it will not, and will

cause its employees, officers, directors and the employees, officers, and directors of the authorized Ferrari dealers in North America and Central and South America to not, (i) modify or suffer to be modified by any third party any Original Content, or (ii) transfer any Original Content to any third party in exchange for remuneration. FNA hereby acknowledges and agrees that Intelliga may use such Original Content as does not contain Confidential Information in Intelliga's marketing materials and/or marketing presentations to third parties. During the term of this Agreement and for a period of one year thereafter, Intelliga shall not publish or otherwise redistribute (other than as set forth in the immediately preceding sentence) any Original Content included in the Ferrari Dealer Extranet.

(d) From time to time, during the term of this Agreement, FNA may provide to Intelliga, or cause third parties to provide to Intelliga, materials as to which such persons retain intellectual property rights. Intelliga will not assert intellectual property rights in such materials, nor shall Intelliga use such material in, or modify such materials for use in, the Ferrari Dealer Extranet or otherwise use such material without the express permission of the holder(s) thereof to do so. For purposes of this Agreement, FNA acknowledges that Intelliga may deem such materials provided to be the intellectual property of FNA, and rely on FNA's instructions in respect thereof, absent explicit notice to the contrary.

## 6. Indemnity

(a) For all Works of Authorship developed by Intelliga, Intelliga shall at its expense, defend FNA from any claim or action brought against FNA alleging that the Works of Authorship or use thereof infringes or constitutes misappropriation of any intellectual property rights of a third party ("Third Party Rights") including, without limitation, any patent, trade secret, copyright, trademark, service mark and/or trade names of a third party (such as Third Party Rights related to third party source code, marks of third parties that appear in the screen display, patented coding techniques and patented operations of computers), and Intelliga shall, subject to the limitations set forth below, indemnify FNA and hold it harmless from any costs, damages and fees (including attorneys' fees) awarded against or incurred by FNA in connection with such claim or action. Should such Works of Authorship become, or in Intelliga's opinion be likely to become, the subject of such a claim or action, Intelliga shall (x) procure for FNA, at no cost to FNA, the right to continue to use the Works of Authorship, or (y) replace or modify the infringing portion of the Works of Authorship at no cost to FNA, or make the Works of Authorship noninfringing, provided that the replacement or modified Works of Authorship provides substantially similar function and performance. For clarity, FNA acknowledges that the foregoing indemnity shall not apply to (i) any claims related to the FNA name, any trademark owned by FNA or its Affiliates or any other intellectual property owned by FNA or its Affiliates in which FNA or any of its Affiliates claims an interest (other than by virtue of paragraph 7), (ii) any claim that use of materials provided to Intelliga by FNA, its Affiliates, any authorized Ferrari dealer in North America or any third party at the behest of FNA violates Third Party Rights or (iii) any reproduction or use of Works of Authorship by any third party downloaded by such person prior to removal thereof from the Ferrari Dealer Extranet. For clarity, for purposes of this paragraph 6, inclusion in the Ferrari Dealer Extranet of articles, excerpts thereof or images originally published by third parties shall not be deemed development thereof by Intelliga. Furthermore, Intelliga reserves the right remove from the Ferrari Dealer Extranet, as applicable, at any time, and without prior notice to FNA, any or all such articles, excerpts or images.

(b) For all Works of Authorship provided by FNA, its Affiliates, any authorized Ferrari dealer in North America or any third party at the behest of FNA, including, without limitation, Derivative Works of Authorship created by Intelliga from such Works of Authorship, FNA shall at its expense, defend Intelliga from any claim or action brought against Intelliga alleging that such Works of Authorship or Derivative Works of Authorship or use thereof infringe or constitute misappropriation of any Third Party Rights including, without limitation, any patent, trade secret, copyright, trademark, service mark and/or trade names of a third party (such as Third Party Rights related to third party source code, marks of third parties that appear in the screen display, patented coding techniques and patented operations of computers), and FNA shall indemnify Intelliga and hold it harmless from any costs, damages and fees (including attorneys' fees) awarded against or incurred by Intelliga in connection with such claim or action. Should the Works of Authorship become, or in FNA's opinion be likely to become, the subject of such a claim or action, FNA shall (x) procure for Intelliga, at no cost to Intelliga, the right to continue to use the Works of Authorship, or (y) replace or modify the infringing portion of the Works of Authorship at no cost to Intelliga, or make the Works of Authorship noninfringing, provided that the replacement or modified Works of Authorship provides substantially similar function and performance. For clarity, Intelliga acknowledges that the foregoing indemnity shall not apply to any claims related to the Intelliga name, any trademark owned by Intelliga or any other intellectual property owned by Intelliga or in which Intelliga claims an interest (other than by virtue of paragraph 7). FNA shall, at its expense, defend Intelliga from any claim or action brought against Intelliga alleging that the inclusion in the Ferrari Dealer Extranet of articles, excerpts thereof or images originally published by third parties infringes or constitutes misappropriation of any Third Party Rights including, without limitation, any copyright, trademark, service mark and/or trade names of a third party, and FNA shall indemnify

Intelliga and hold it harmless from any costs, damages and fees (including attorneys' fees) awarded against or incurred by Intelliga in connection with such claim or action. FNA may, at any time, remove from the Ferrari Dealer Extranet any or all such articles, excerpts or images.

## 7. Trademarks

Neither Party to this Agreement shall have any right to use the trade-marks or trade names of the other Party to this Agreement directly or indirectly, in connection with any product, or service without the written consent of said other Party; provided that this shall not be deemed to prevent either Party from informing third parties of the business relationship between the Parties.

## 8. Non-solicitation

Both Parties agree that during the term of this Agreement and for one year thereafter, neither shall, directly or indirectly, offer employment to any employee of any other Party without prior written consent of such other Party.

## 9. Defined Terms

"**Affiliates**" One business entity is deemed to be affiliated with another business entity if, but only if, one of them is the subsidiary of the other or both are direct or indirect subsidiaries of the same business entity or each of them is controlled directly or indirectly by the same person.

"**Confidential Information or Material**" of FNA is any information or material:

(a) generated or collected by or utilized in the operation of FNA or its Affiliates that relates to the actual or anticipated business or research and development of FNA or its Affiliates; or

(b) suggested by or resulting from any task assigned to Intelliga or work performed by Intelliga for or on behalf of FNA or its Affiliates;

which has not been made available generally to the public and is marked by FNA as "Confidential".

"**Party**" means either FNA or Intelliga, and "**Parties**" means FNA and Intelliga.

"**Services**" means those services set out from time to time in the Schedules hereto, as the same may be replaced and/or amended.

"**Work of Authorship**" includes books, Original Content, computer programs, drawings, notes, reports, other documents and materials, magnetic electronic, sound or video recordings and photographs or cinematographic films or any other work in which copyright or any right of a similar nature may subsist.

"**Derivative Work of Authorship**" means a work based upon one or more preexisting Works of Authorship including without limitation a translation, abridgment, condensation, or any other form in which a work may be recast, transformed, or adopted.

## 10. General Terms

(a) This Agreement shall come into force, as of January 1, 2014.

(b) FNA acknowledges receipt of a copy of this Agreement and that this Agreement, including Schedules A and B, constitutes the entire Agreement between the Parties as of the date hereof pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties and there are no warranties, representations or other agreements between the Parties in connection with the subject matter hereof except as specifically set forth herein.

(c) Each of the provisions contained in this Agreement is distinct and severable and a declaration of invalidity or unenforceability of any such provision or part thereof by a court of competent jurisdiction shall not affect the validity or enforceability of any other provision of this Agreement.

(d) No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision (whether or not similar) nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

(e) Neither this Agreement nor any rights or obligations hereunder shall be assignable by any Party without the prior written consent of the other Party. Subject thereto, this Agreement shall inure to the benefit of, and be binding upon the Parties and their respective heirs, executors, administrators, successors and permitted assigns.

(f) Each Party represents and warrants in favor of the other that it has all necessary capacity and authority to enter into this Agreement and to carry out its respective obligations hereunder and that such Party is not a party to, bound or affected by or subject to any indenture, mortgage, lease agreement, instrument, charter or by-law provision, statue, judgment, decree or law which would be violated, contravened, breached by, or under which default would occur as a result of, the execution and delivery of this Agreement and the performance of its respective obligations hereunder.

(g) Time shall be of the essence of this Agreement.

(h) Each Party hereby agrees that upon the written request of the other Party, it will do all such acts and execute all such further documents, conveyances, deeds, assignments, and transfers and the like, and will cause the doing of all such acts and will cause the execution of all such further documents as are within its power to cause the doing or execution of, as the other Party may from time to time reasonable request be done and/or executed as may be required to effect the purposes of this Agreement and to carry out the provisions hereof.

(i) Any notice required or permitted to be given hereunder shall be in writing and shall be sufficiently given if delivered in person during normal business hours of the recipient on a business day, or the next business day if by Federal Express or other recognized overnight delivery service:

    (i) in the case of notice to Intelliga to:

        Intelliga Communications Inc.

        3184 Ridgeway Drive, Unit #45, Mississauga, Ontario, Canada, L5L 5S7

        Attention: Mark Davidson, President

        MRDavidson@intelliga.com

    (ii) in the case of notice to FNA to:

        Ferrari North America, Inc.

        250 Sylvan Avenue, Englewood Cliffs, New Jersey, U.S.A., 07632

        Attention: Paul Montopoli, Director of Motorsport, CRM and Market Intelligence

        Facsimile: 201-816-1436

        E-mail: PMontopoli@FerrariUSA.com

        with copy to:

        Ferrari North America, Inc.

        250 Sylvan Avenue, Englewood Cliffs, New Jersey, U.S.A., 07632

        Attention: David Wertheim, Vice President and General Counsel

        Facsimile: 201-816-2676

        E-mail: DWertheim@FerrariUSA.com

and shall be conclusively deemed to have been given and to have been received on the following business day, Addresses for notice may be changed by giving notice in accordance with the foregoing.  FNA agrees to pay the expenses of using Federal Express or other recognized overnight delivery service in respect of notices provided under this Agreement.

(j) The remedies of each Party under this Agreement shall be cumulative and not alternative and the election of one remedy for a breach shall not necessarily preclude pursuit of other remedies.

(k) The failure of a Party, at any time or from time to time, to require performance of any obligations of the other Party hereunder shall not affect its right to enforce any provisions of this Agreement at a subsequent time, and the waiver of any rights arising out of any breach shall not be construed as a waiver of any rights arising out of any prior or subsequent breach.

(l) This Agreement shall be governed by the internal laws of the State of New Jersey without reference to its principles of conflicts of laws.  The state and federal courts of competent subject-matter jurisdiction located within the state of New Jersey shall have exclusive jurisdiction to resolve any disputes arising out of this Agreement. The Parties consent to service of process by Federal Express or other recognized overnight delivery service at the notice addresses described in Paragraph 10(i) of this Agreement.  The Parties, to the fullest extent possible, waive trial by jury.

(m) The provisions of Articles 2, 3(d), and 4 through 10 shall remain in effect after the termination of this Agreement, until such time as the Parties mutually agree to the release of the obligations contained therein, or the obligations thereunder otherwise expire.  No termination of this Agreement by either Party shall affect the rights and obligations of the other Party which have accrued as of the date of such termination.

IN WITNESS WHEREOF the Parties hereto have executed this Consulting Services Agreement as of the date first above written

**FERRARI NORTH AMERICA, INC.**

Name: _____          Signature: _____
Title: _____           Date: _____
Facsimile: _____
Address:   250 Sylvan Avenue, Englewood Cliffs, New Jersey, U.S.A., 07632

**INTELLIGA COMMUNICATIONS, INC.**

Name:   Mark Davidson                    Signature: _____
Title:   President                             Date: _____
Address:   3184 Ridgeway Drive, Unit #45, Mississauga, Ontario, Canada, L5L 5S7

# Schedule A
## General Governance of Payments

This Schedule A shall be deemed an integral part of that certain Consulting Services Agreement ("CSA") dated as of January 1, 2014 by and between Ferrari North America, Inc. and Intelliga Communications, Inc. (together with its authorized subcontractors) and is subject to the provisions thereof.

## 1. Currency

For the purposes of this Agreement all fees stated and payments due will be in U.S. Dollars.

## 2. Payment Schedule

Except where otherwise agreed and stated in writing, Intelliga will be paid for services and developments on each project, sub-project, or Schedule on the basis of fifty percent (50%) at time of approval and/or hire, twenty-five percent (25%) at an agreed project or sub-project milestone or the temporal mid-point of the project or sub-project, and the final twenty five percent (25%) including any and all outstanding expenses upon project or sub-project completion per terms set out on the invoice (generally within thirty (30) days of receipt).

## 3. Additional Work

(a) Should FNA require or desire to retain Intelliga to perform modifications, additions or improvements to developments outside the scope of any other schedule to the CSA or provide other consulting services, FNA shall submit a written proposal or "change order" to Intelliga stating the proposed scope of any Additional Services. Upon receipt of a written proposal for Additional Services, Intelliga shall submit to FNA a detailed cost estimate for the proposed Additional Services. The cost estimate may be quoted on a fixed fee or on a per hour basis.

(b) The hourly rate specified in 3(c) is subject to change upon 30-days' prior written notice.

(c) Intelliga establishes the following minimum hourly fees based on the type of work performed:

| | |
|---|---|
| Client Mandated Partner Time | $400.00/hour |
| Strategic consultancy including Marketing, Strategy, Business, Management, Sponsorship/Activation, and Security or tasks Intelliga deems to be of similar value | $300.00/hour |
| Client-requested Resource Review (whenever client specifies by which officer, employee or subcontractor for one or more Services are to be performed) | $300.00/hour |
| Management of Third Parties (e.g. other providers of services to client), if required by client, Senior Project Management, IT Consulting, Business Analysis, or tasks Intelliga deems to be of similar value | $200.00/hour |
| Project Management, Copy Editing, Technical Troubleshooting, Analytics, Ad-Hoc User Support, Marketing/Media planning or buying, Software Engineering and development (programming), UI Design, Copywriting, Photography, or tasks Intelliga deems to be of similar value | $150.00/hour |
| HTML, Graphical site content, Graphics manipulation, Scanning, Editing, otherwise un-accounted Travel Time, extra-contractual administrative tasks devolved upon Intelliga by client, or tasks Intelliga deems to be of similar value | $120.00/hour |

## 4. Expenses

FNA shall reimburse Intelliga for all reasonable out-of-pocket expenses, including, without limitation, commercial air transportation between Toronto, Ontario and the tri-state area (or such other locations as may be required by FNA), local transportation by taxi or rental car, and reasonable hotel costs as required by FNA for Intelliga to perform the Services.  FNA shall reimburse Intelliga for the use of private cars as provided in the then-current IRS guidelines. FNA shall reimburse Intelliga for such publications as Intelliga deems reasonably necessary to effectively perform the Services.

IN WITNESS WHEREOF the Parties hereto have executed this Schedule A to that certain Consulting Services Agreement by and between the Parties hereto dated as of January 1, 2014.

**FERRARI NORTH AMERICA, INC.**

Name: _____     Signature: _____

Title: _____     Date: _____

Facsimile: _____

Address:   250 Sylvan Avenue, Englewood Cliffs, New Jersey, U.S.A., 07632

**INTELLIGA COMMUNICATIONS, INC.**

Name:   Mark Davidson     Signature: _____

Title:   President     Date: _____

Address:   3184 Ridgeway Drive, Unit #45, Mississauga, Ontario, Canada, L5L 5S7

# Schedule B

## Basic Dealer Extranet and Associated Marketing Communications Project

This Schedule B shall be deemed an integral part of that certain Consulting Services Agreement ("CSA") dated as of January 1, 2014 by and between Ferrari North America, Inc. and Intelliga Communications, Inc. (together with its authorized subcontractors) and is subject to the provisions thereof.

## 1. Extranet License

License for up to 50 dealerships and other locations to use the Reservoir Digital Asset Management System and the Ferrari Dealer Extranet (the "Extranet") with one user per account and one account per user.

## 2. Services To Be Provided

(a) License to use the Reservoir Asset Management System and the Ferrari Dealer Extranet (the "Extranet"). License includes support for technical problems Intelliga deems to be a fault in Intelliga's code when the Extranet software is used as reasonably intended by Intelliga, plus up to the lesser of thirty (30) minutes or two (2) incidents each month of user support as defined by Intelliga.

(b) Intelliga will maintain the Extranet for use by FNA and authorized North, Central and South American Ferrari dealers.

(c) The Extranet, which may include HTML, images, and scripts, will operate on a Web server, operating system, and database server provided by FNA.

(d) Intelliga will create and/or upload for FNA all of the following content and make available to Extranet users:

    (i) Header images

    (ii) Ensure Homepage module contents are displayed correctly ('latest bulletins', 'what's new'); work with FNA employees with upload rights to ensure that their uploaded materials conform to FNA Marketing's guidelines

    (iii) System Messages

    (iv) Homepage modules except when significant coding is required

    (v) New Folders as requested (within current capabilities of the system) when security settings render FNA incapable of establishing such new folders.  FNA retains responsibility for creating new folders in all other circumstances

    (vi) Folder deletion with FNA direction.  FNA will provide direction regarding and effect movement of the contents of folders to be deleted

    (vii) Car Price Calculator data (based on complete price and option data as supplied by FNA no less than 20 business days prior to update)

    (viii) Apply updated dealer zip-assign files provided by FNA to the Extranet

    (ix) Maintain content security as related to user access

    (x) Maintain the organization of dealers, dealer regions and area sales managers within the system, including activating new dealerships and deactivating dealerships, but excluding the addition or deactivation of dealer staff user accounts

    (xi) Evaluate and Process special user account requests (those which are beyond the capabilities of Admin tools provided for FNA by Intelliga); this may include but is not limited to adding new groups to an existing user's account, moving users from group to group and reactivating deactivated users

    (xii) Evaluate and process third party user account requests per Paragraph 5, Section b of the CSA

    (xiii) Provide technical support for system failures to FNA and dealer staff within FNA business hours; provide FNA IT with information to investigate and resolve user issues related to Extranet access not due to system failures

    (xiv) Work with FNA IT for provision of Extranet and Marketing Services on existing IT Hardware

    (xv) Make basic changes to the system – those which do not require recoding - as requested by FNA and if agreed by Intelliga

    (xvi) Update the underlying Reservoir software with the latest Intelliga releases as Intelliga deems fit

    (xvii) The lesser of up to three (3) hours or twelve (12) incidents per month of user support as defined by Intelliga.

(e) Maintenance and tasks associated with the Inventory Survey / Interest List / Wait List / Lead Management.

3. **Project Director and Approval**

FNA acknowledges that Intelliga's provision of the Services set forth in Paragraph 1 of this Schedule B shall require cooperation and coordination with FNA. FNA has heretofore designated Paul Montopoli as the FNA Project Director. FNA may replace the Project Director at any time on not less than five business days' notice to Intelliga. Additionally, FNA may, from time to time, designate such other persons as FNA may deem reasonable to interface with Intelliga on non-critical matters relating to the Services to be provided under this Schedule B. Project Director and assistant Project Director (upon Project Director's unavailability) will be responsible for providing timely responses to e-mail and/or telephone queries from Intelliga's staff and approved sub-contractors. Project Director shall be reasonably available to meet with Intelliga's staff or approved sub-contractors. Project Director and assistant Project Director shall be responsible to provide materials reasonably required by Intelliga for the performance of the Services set forth in this Schedule B; such materials to be provided in a timely manner and at FNA's sole expense. Intelliga will be entitled to rely on responses from Project Director, or if Project Director is not available on a timely basis, assistant Project Director. All deliverables set forth in Paragraph 1 of this Schedule B are subject to approval of FNA as represented by Project Director, or as applicable, assistant Project Director.

4. **Compensation**

Total compensation for the Services provided pursuant to this Schedule B shall be in the amounts below. As defined below, Maintenance Fees, License Fees and Dealer Access Fees will be payable in full by FNA. Payment shall be made to Intelliga by FNA as follows:

(a) On January 1, 2014, $51,000.00 became due and payable by FNA to Intelliga for the 2014 license for its employees and authorized dealer staff to use the Reservoir Asset Management System and the Ferrari Dealer Extranet during the 2014 calendar year. Intelliga reserves the right to terminate licensee access to the Reservoir Asset Management System and the Ferrari Dealer Extranet if such amount is not paid in full by December 10, 2014. Intelliga will restore licensee access within 24 hours of clearance of the license amount into Intelliga's bank account. No reduction will be given in respect of the license fee in connection with any such suspension of service. In addition, Intelliga may charge a late fee in respect of the license fee or any other amount payable hereunder at the rate of 1.0% per month.

The License Fee is based on an anticipated annual usage of between 501 and 600 users at approximately 50 dealership locations and FNA headquarters. If the number of dealerships is increased or reduced, the License Fee may be increased or reduced, as applicable, to reflect partial years and more or fewer locations as set forth below:

| Number of Locations | Annual License Fee |
|---|---|
| Headquarters and up to 5 Third Party Accounts | $28,000 |
| 10 or Fewer Dealerships | $34,000 |
| 11-20 Dealerships | $39,000 |
| 21-30 Dealerships | $43,000 |
| 31-40 Dealerships | $47,000 |
| 41-50 Dealerships | $51,000 |
| 51-60 Dealerships | $55,000 |
| 61-70 Dealerships | $59,000 |
| 81 Dealerships or more | To be determined |

To the extent that the number of dealerships using the Reservoir Asset Management System and the Ferrari Dealer Extranet is reduced by FNA during the 2014 calendar year, Intelliga will partially and proportionately (based on whole calendar months of reduced usage) apply such reduction in the License Fee to FNA's 2015 contract with Intelliga, if any.

(b) On or prior to December 10, 2014, FNA will pay Intelliga $110,700 for the services outlined in Paragraphs 2(a)-(e) of this Schedule B as performed or to be performed during the months of January through December 2014.

(c) Specific vendors or other third parties may, upon terms to be mutually agreed between Intelliga and FNA (which terms may include such third party's signing a Non-Disclosure and Non-Compete agreement acceptable to both Intelliga and FNA) be granted access to the Ferrari Dealer Extranet.

The Service Fee set forth in Paragraph 4(b) above is based on an anticipated annual usage of between 501 and 600 users at approximately 50 existing dealership locations and FNA headquarters. The Service Fee is calculated based on a reasonable degree of turn-over at existing dealer locations and FNA headquarters and on the addition of no more than five new dealership locations per contract year. FNA shall keep Intelliga informed of all changes to the authorized Ferrari dealers in North America, Central America, and South America. A dealership will be deemed to have become active for the purposes of inclusion in Extranet billing by Intelliga if it has signed a letter of intent or contract with FNA or its affiliates to become an authorized Ferrari dealer, and/or if it has sold a Ferrari automobile acquired directly through FNA, and/or if two or more of its staff or prospective staff have been provided with access to the Ferrari Dealer Extranet. If more than five new authorized dealers are added during the term of the CSA, a one time Service Fee shall be assessed for each additional authorized dealer in the amount of $2,000.00.

## 5. Additional Work and Expenses

Out-of-scope work requested by FNA, including any features that are included in FNA's Requests for Proposal or in any proposal submitted by Intelliga but not specifically included in this Schedule B or reflected on a separate schedule to the CSA, will be billed on a time and materials basis per Schedule A of the CSA, or in such other manner as the Parties may agree.

FNA shall reimburse Intelliga for expenses related to development and maintenance of the Extranet as set forth in Schedule A.

IN WITNESS WHEREOF the Parties hereto have executed this Schedule B to that certain Consulting Services Agreement by and between the Parties hereto dated as of January 1, 2014.

**FERRARI NORTH AMERICA, INC.**

| | | | |
|---|---|---|---|
| Name: | _____ | Signature: | _____ |
| Title: | _____ | Date: | _____ |
| Facsimile: | _____ | | |

Address:   250 Sylvan Avenue, Englewood Cliffs, New Jersey, U.S.A., 07632

**INTELLIGA COMMUNICATIONS, INC.**

| | | | |
|---|---|---|---|
| Name: | Mark Davidson | Signature: | _____ |
| Title: | President | Date: | _____ |

Address:   3184 Ridgeway Drive, Unit #45, Mississauga, Ontario, Canada, L5L 5S7

EXHIBIT B

# Consulting Services Agreement

THIS CONSULTING SERVICES AGREEMENT (this "Agreement") dated as of the 1st day of January, 2013 by and between Ferrari North America, Inc. ("FNA") a Delaware corporation and Intelliga Communications, Inc. (together with its authorized subcontractors, "Intelliga") an Ontario corporation.

## *Recitals*

WHEREAS, FNA wishes to retain Intelliga to provide services (collectively, the "Services") on the terms and conditions hereinafter set forth including, without limitation, a) proprietary software known as Reservoir, being a unique combination of proprietary and publicly available code designed to run on the Microsoft Windows operating system as a secure and expandable digital asset management system and associated snap-ins accessible via networked computers (the "Ferrari Dealer Extranet"), b) text, design, and imagery for use online or offline created *sui generis* or through substantial modification for the use of FNA at its behest, including but not limited to reference and educational materials such as product knowledge brochures or marketing materials such as strategic brand documents and sales and marketing collateral ("Original Content"), and c) sales, marketing and branding advice, each of such Services shall be as more fully described on schedules executed by the Parties hereto and appended to this Agreement from time to time.

Whereas, Intelliga represents that it possesses the skill and expertise to perform the Services, and that it wishes to provide Services to FNA on the terms and conditions set forth herein.

NOW THEREFORE in consideration of the premises, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## 1. Services to be Provided

(a) Intelliga agrees to provide FNA the Services.

(b) Intelliga agrees and undertakes to perform the Services in a timely fashion with all due skill, competence and diligence.

(c) Intelliga agrees that FNA shall have, at reasonable times, access to the work product, or any component thereof, which Intelliga produces in performing the Services.

## 2. Compensation

FNA shall pay Intelliga for the Services in accordance with the terms set out in Schedules as may be executed from time to time and appended hereto, which Schedules shall be deemed to be an integral part hereof as though set forth in full herein. Intelliga may, at its option, charge interest on overdue amounts at the rate of 1.0% per month from the date such amounts were first due hereunder.

## 3. Term and Termination

(a) This Agreement shall be effective from January 1, 2013 for a one year term unless earlier terminated in accordance with the provisions hereof and shall terminate without cause and without need for any notice on December 31, 2013; provided that (i) obligations that by their terms extend beyond December 31, 2013 (e.g. confidentiality, no reverse engineering, etc.) shall continue as provided herein and (ii) any payment obligations under the Agreement or any other agreement between the Parties not theretofore paid by FNA, shall be due and payable December 31, 2013, and interest rates applicable thereto shall remain in force and effect from December 31, 2013. The Parties may wish to negotiate a new agreement in respect of subsequent periods upon such terms as the Parties may agree.

(b) This Agreement may be terminated by FNA upon notice to Intelliga solely upon the occurrence of an event of default by Intelliga. Each of the following constitutes an event of default by Intelliga for the purposes of this Agreement, if Intelliga or its employees (or subcontractors):

(i) commits any material dishonest or fraudulent act in the performance of any of his or her obligations hereunder or any material misrepresentation hereunder; or

(ii) persistently fails to perform the Services as required hereunder; or

(iii) otherwise fails to perform or comply with any material term, condition or covenant of this Agreement, after notice and reasonable opportunity to cure.

(c) This Agreement may be terminated by Intelliga upon notice to FNA upon the occurrence of an event of default. Each of the following constitutes an event of default by FNA for the purposes of this Agreement, if:

(i) FNA fails to make payments for the Services for 30 days or more after the due date therefor reflected in the Schedules hereto, or, for Services for which a payment schedule is not reflected in the Schedules hereto,

within 30 days of invoice therefor, unless such amounts are disputed in writing by FNA with applicable support therefor within 15 days of receipt of such invoice;

(ii) FNA, its Affiliates, the authorized Ferrari dealers in North, South or Central America, or any of their respective employees, officers or directors:

    1.   commits any material dishonest or fraudulent act which affects the Ferrari Dealer Extranet or adversely reflects on, or affects, Intelliga or Intelliga's reputation or

    2.   otherwise fails to perform or comply with any material term, condition or covenant of this Agreement, after notice and reasonable opportunity to cure, or

    3.   allows access to the Ferrari Dealer Extranet other than as permitted pursuant to this Agreement; or

    4.   allows misappropriation of any of Intelliga's Intellectual Property by any employee, officer or third party;

(iii) FNA elects to reduce the Services provided under the various Schedules hereto, so that the monthly amounts billable thereunder are reduced below 80% of the aggregate amount billable under the schedules of the contract between the Parties for December 2012.

(d) Upon termination of this Agreement, Intelliga shall be entitled to retain all fees previously received and to receive fees that have accrued but are unpaid. Intelliga shall not be entitled to any further fees under this Agreement, except reimbursement of expenses in accordance with Schedule A hereto. Intelliga shall forthwith upon termination of this Agreement and request therefor by FNA return to FNA all confidential data of FNA embodied or recorded in tangible form which is in Intelliga's possession.

## 4. Confidentiality

(a) Intelliga will not, without FNA's prior written permission, disclose to anyone outside of FNA or its Affiliates or use for other than FNA or its Affiliates, during the term of this Agreement or thereafter, any Confidential Information or Material of FNA, or any information, material received in confidence from third parties by FNA or its Affiliates, or material provided to Intelliga by third parties at the behest of FNA or its Affiliates. Upon termination of this Agreement, and request therefor by FNA, Intelliga will return all FNA property in its possession, including all Confidential Information or Material such as drawings, notebooks, reports, and other documents.

(b) Intelliga will not disclose to FNA, use in FNA's business, or cause FNA to use, any information or material which is confidential to others in the absence of permission to do so.

## 5. Copyright and Ownership

(a) Intelliga shall have all proprietary interests, including Intellectual Property interests, in everything that Intelliga and its employees and subcontractors, alone or with others, create or substantially modify for FNA including inventions, computer programs (and related documentation and materials), and Works of Authorship (which are collectively referred to herein as "Developments"). Without limitation, all working papers, notes and memoranda which are obtained by Intelliga from FNA, in the course of this Agreement shall be property of FNA and will accordingly be provided to FNA upon termination of this Agreement and request therefor.

(b) During the term of this Agreement, Intelliga shall provide FNA with annual runtime licenses allowing the Ferrari Dealer Extranet to be available for any FNA employees and authorized Ferrari dealers in North, South and Central America on any workstation or computer within property owned, leased or rented by FNA or any of the authorized Ferrari dealers in North America and Central and South America. During the term of this Agreement and thereafter, FNA agrees that it will not, and will cause its employees, officers, directors and the employees, officers, and directors of the authorized Ferrari dealers in North America and Central and South America to not attempt to copy, emulate or reverse engineer the Ferrari Dealer Extranet or any part thereof or otherwise modify or develop the Ferrari Dealer Extranet or any part thereof and/or market to any third party any digital asset management system. Nor shall FNA, during the term of this Agreement or thereafter, without the prior written consent of Intelliga, transfer to any third party or suffer to be transferred to any third party the Ferrari Dealer Extranet or any part thereof or allow access thereto for any purpose. FNA acknowledges that any such transfer or attempted transfer by FNA of the Ferrari Dealer Extranet or access thereto by any third party without prior written consent of Intelliga is a breach of this Agreement and of the applicable license and may result in immediate termination of all access to the Ferrari Dealer Extranet and any other software systems (including without limitation, "snap-ins") based upon, linked with, or accessed through Intelliga's Reservoir software.

(c) Intelliga hereby grants to FNA and the authorized Ferrari dealers in North, South and Central America a non-transferable, limited license to use all Original Content included in the Ferrari Dealer Extranet upon the following terms: During the term of this Agreement and for a period of one year thereafter, FNA may distribute such Original Content free of charge to its employees, officers, and directors and authorized Ferrari dealers in North America and Central and South America and their respective customers and potential customers, provided that such persons acknowledge that they have no rights, without the prior written consent of FNA and Intelliga, to

further distribute, redevelop or otherwise exploit such Original Content. During the term of this Agreement and for a period of one year thereafter, without prior written consent of Intelliga, FNA agrees that it will not, and will cause its employees, officers, directors and the employees, officers, and directors of the authorized Ferrari dealers in North America and Central and South America to not, (i) modify or suffer to be modified by any third party any Original Content, or (ii) transfer any Original Content to any third party in exchange for remuneration. FNA hereby acknowledges and agrees that Intelliga may use such Original Content as does not contain Confidential Information in Intelliga's marketing materials and/or marketing presentations to third parties. During the term of this Agreement and for a period of one year thereafter, Intelliga shall not publish or otherwise redistribute (other than as set forth in the immediately preceding sentence) any Original Content included in the Ferrari Dealer Extranet.

(d) From time to time, during the term of this Agreement, FNA may provide to Intelliga, or cause third parties to provide to Intelliga, materials as to which such persons retain intellectual property rights. Intelliga will not assert intellectual property rights in such materials, nor shall Intelliga use such material in, or modify such materials for use in, the Ferrari Dealer Extranet or otherwise use such material without the express permission of the holder(s) thereof to do so. For purposes of this Agreement, FNA acknowledges that Intelliga may deem such materials provided to be the intellectual property of FNA, and rely on FNA's instructions in respect thereof, absent explicit notice to the contrary.

## 6. Indemnity

(a) For all Works of Authorship developed by Intelliga, Intelliga shall at its expense, defend FNA from any claim or action brought against FNA alleging that the Works of Authorship or use thereof infringes or constitutes misappropriation of any intellectual property rights of a third party ("Third Party Rights") including, without limitation, any patent, trade secret, copyright, trademark, service mark and/or trade names of a third party (such as Third Party Rights related to third party source code, marks of third parties that appear in the screen display, patented coding techniques and patented operations of computers), and Intelliga shall, subject to the limitations set forth below, indemnify FNA and hold it harmless from any costs, damages and fees (including attorneys' fees) awarded against or incurred by FNA in connection with such claim or action. Should such Works of Authorship become, or in Intelliga's opinion be likely to become, the subject of such a claim or action, Intelliga shall (x) procure for FNA, at no cost to FNA, the right to continue to use the Works of Authorship, or (y) replace or modify the infringing portion of the Works of Authorship at no cost to FNA, or make the Works of Authorship noninfringing, provided that the replacement or modified Works of Authorship provides substantially similar function and performance. For clarity, FNA acknowledges that the foregoing indemnity shall not apply to (i) any claims related to the FNA name, any trademark owned by FNA or its Affiliates or any other intellectual property owned by FNA or its Affiliates in which FNA or any of its Affiliates claims an interest (other than by virtue of paragraph 7), (ii) any claim that use of materials provided to Intelliga by FNA, its Affiliates, any authorized Ferrari dealer in North America or any third party at the behest of FNA violates Third Party Rights or (iii) any reproduction or use of Works of Authorship by any third party downloaded by such person prior to removal thereof from the Ferrari Dealer Extranet. For clarity, for purposes of this paragraph 6, inclusion in the Ferrari Dealer Extranet of articles, excerpts thereof or images originally published by third parties shall not be deemed development thereof by Intelliga. Furthermore, Intelliga reserves the right remove from the Ferrari Dealer Extranet, as applicable, at any time, and without prior notice to FNA, any or all such articles, excerpts or images.

(b) For all Works of Authorship provided by FNA, its Affiliates, any authorized Ferrari dealer in North America or any third party at the behest of FNA, including, without limitation, Derivative Works of Authorship created by Intelliga from such Works of Authorship, FNA shall at its expense, defend Intelliga from any claim or action brought against Intelliga alleging that such Works of Authorship or Derivative Works of Authorship or use thereof infringe or constitute misappropriation of any Third Party Rights including, without limitation, any patent, trade secret, copyright, trademark, service mark and/or trade names of a third party (such as Third Party Rights related to third party source code, marks of third parties that appear in the screen display, patented coding techniques and patented operations of computers), and FNA shall indemnify Intelliga and hold it harmless from any costs, damages and fees (including attorneys' fees) awarded against or incurred by Intelliga in connection with such claim or action. Should the Works of Authorship become, or in FNA's opinion be likely to become, the subject of such a claim or action, FNA shall (x) procure for Intelliga, at no cost to Intelliga, the right to continue to use the Works of Authorship, or (y) replace or modify the infringing portion of the Works of Authorship at no cost to Intelliga, or make the Works of Authorship noninfringing, provided that the replacement or modified Works of Authorship provides substantially similar function and performance. For clarity, Intelliga acknowledges that the foregoing indemnity shall not apply to any claims related to the Intelliga name, any trademark owned by Intelliga or any other intellectual property owned by Intelliga or in which Intelliga claims an interest (other than by virtue of paragraph 7). FNA shall, at its expense, defend Intelliga from any claim or action brought against Intelliga alleging that the inclusion in the Ferrari Dealer Extranet of articles, excerpts thereof or images originally

published by third parties infringes or constitutes misappropriation of any Third Party Rights including, without limitation, any copyright, trademark, service mark and/or trade names of a third party, and FNA shall indemnify Intelliga and hold it harmless from any costs, damages and fees (including attorneys' fees) awarded against or incurred by Intelliga in connection with such claim or action.  FNA may, at any time, remove from the Ferrari Dealer Extranet any or all such articles, excerpts or images.

## 7.  Trademarks

Neither Party to this Agreement shall have any right to use the trade-marks or trade names of the other Party to this Agreement directly or indirectly, in connection with any product, or service without the written consent of said other Party; provided that this shall not be deemed to prevent either Party from informing third parties of the business relationship between the Parties.

## 8.  Non-solicitation

Both Parties agree that during the term of this Agreement and for one year thereafter, neither shall, directly or indirectly, offer employment to any employee of any other Party without prior written consent of such other Party.

## 9.  Defined Terms

"**Affiliates**" One business entity is deemed to be affiliated with another business entity if, but only if, one of them is the subsidiary of the other or both are direct or indirect subsidiaries of the same business entity or each of them is controlled directly or indirectly by the same person.

"**Confidential Information or Material**" of FNA is any information or material:

(a) generated or collected by or utilized in the operation of FNA or its Affiliates that relates to the actual or anticipated business or research and development of FNA or its Affiliates; or

(b) suggested by or resulting from any task assigned to Intelliga or work performed by Intelliga for or on behalf of FNA or its Affiliates;

which has not been made available generally to the public and is marked by FNA as "Confidential".

"**Party**" means either FNA or Intelliga, and "**Parties**" means FNA and Intelliga.

"**Services**" means those services set out from time to time in the Schedules hereto, as the same may be replaced and/or amended.

"**Work of Authorship**" includes books, Original Content, computer programs, drawings, notes, reports, other documents and materials, magnetic electronic, sound or video recordings and photographs or cinematographic films or any other work in which copyright or any right of a similar nature may subsist.

"**Derivative Work of Authorship**" means a work based upon one or more preexisting Works of Authorship including without limitation a translation, abridgment, condensation, or any other form in which a work may be recast, transformed, or adopted.

## 10. General Terms

(a) This Agreement shall come into force, as of January 1, 2013.

(b) FNA acknowledges receipt of a copy of this Agreement and that this Agreement, including Schedules A and B, constitutes the entire Agreement between the Parties as of the date hereof pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties and there are no warranties, representations or other agreements between the Parties in connection with the subject matter hereof except as specifically set forth herein.

(c) Each of the provisions contained in this Agreement is distinct and severable and a declaration of invalidity or unenforceability of any such provision or part thereof by a court of competent jurisdiction shall not affect the validity or enforceability of any other provision of this Agreement.

(d) No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision (whether or not similar) nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

(e) Neither this Agreement nor any rights or obligations hereunder shall be assignable by any Party without the prior written consent of the other Party.  Subject thereto, this Agreement shall inure to the benefit of, and be binding upon the Parties and their respective heirs, executors, administrators, successors and permitted assigns.

(f) Each Party represents and warrants in favor of the other that it has all necessary capacity and authority to enter into this Agreement and to carry out its respective obligations hereunder and that such Party is not a party to, bound or affected by or subject to any indenture, mortgage, lease agreement, instrument, charter or by-law provision, statue, judgment, decree or law which would be violated, contravened, breached by, or under which

default would occur as a result of, the execution and delivery of this Agreement and the performance of its respective obligations hereunder.

(g) Time shall be of the essence of this Agreement.

(h) Each Party hereby agrees that upon the written request of the other Party, it will do all such acts and execute all such further documents, conveyances, deeds, assignments, and transfers and the like, and will cause the doing of all such acts and will cause the execution of all such further documents as are within its power to cause the doing or execution of, as the other Party may from time to time reasonable request be done and/or executed as may be required to effect the purposes of this Agreement and to carry out the provisions hereof.

(i) Any notice required or permitted to be given hereunder shall be in writing and shall be sufficiently given if delivered in person during normal business hours of the recipient on a business day, or the next business day if by Federal Express or other recognized overnight delivery service:

(i) in the case of notice to Intelliga to:

Intelliga Communications Inc.

3184 Ridgeway Drive, Unit #45, Mississauga, Ontario, Canada, L5L 5S7

Attention: Mark Davidson, President

MRDavidson@intelliga.com

(ii) in the case of notice to FNA to:

Ferrari North America, Inc.

250 Sylvan Avenue, Englewood Cliffs, New Jersey, U.S.A., 07632

Attention: Paul Montopoli, Director of Motorsport, CRM and Market Intelligence

Facsimile: 201-816-1436

E-mail: PMontopoli@FerrariUSA.com

with copy to:

Ferrari North America, Inc.

250 Sylvan Avenue, Englewood Cliffs, New Jersey, U.S.A., 07632

Attention: David Wertheim, Vice President and General Counsel

Facsimile: 201-816-2676

E-mail: DWertheim@FerrariUSA.com

and shall be conclusively deemed to have been given and to have been received on the following business day, Addresses for notice may be changed by giving notice in accordance with the foregoing. FNA agrees to pay the expenses of using Federal Express or other recognized overnight delivery service in respect of notices provided under this Agreement.

(j) The remedies of each Party under this Agreement shall be cumulative and not alternative and the election of one remedy for a breach shall not necessarily preclude pursuit of other remedies.

(k) The failure of a Party, at any time or from time to time, to require performance of any obligations of the other Party hereunder shall not affect its right to enforce any provisions of this Agreement at a subsequent time, and the waiver of any rights arising out of any breach shall not be construed as a waiver of any rights arising out of any prior or subsequent breach.

(l) This Agreement shall be governed by the internal laws of the State of New Jersey without reference to its principles of conflicts of laws. The state and federal courts of competent subject-matter jurisdiction located within the state of New Jersey shall have exclusive jurisdiction to resolve any disputes arising out of this Agreement. The Parties consent to service of process by Federal Express or other recognized overnight delivery service at the notice addresses described in Paragraph 10(i) of this Agreement. The Parties, to the fullest extent possible, waive trial by jury.

(m) The provisions of Articles 2, 3(d), and 4 through 10 shall remain in effect after the termination of this Agreement, until such time as the Parties mutually agree to the release of the obligations contained therein, or the obligations thereunder otherwise expire. No termination of this Agreement by either Party shall affect the rights and obligations of the other Party which have accrued as of the date of such termination.

IN WITNESS WHEREOF the Parties hereto have executed this Consulting Services Agreement as of the date first above written

**FERRARI NORTH AMERICA, INC.**

Name: _____          Signature: _____

Title: _____          Date: _____

Facsimile: _____

Address:    250 Sylvan Avenue, Englewood Cliffs, New Jersey, U.S.A., 07632

**INTELLIGA COMMUNICATIONS, INC.**

Name:    Mark Davidson                    Signature: _____

Title:    President                       Date: _____

Address:    3184 Ridgeway Drive, Unit #45, Mississauga, Ontario, Canada, L5L 5S7

---

# Schedule A
## General Governance of Payments

This Schedule A shall be deemed an integral part of that certain Consulting Services Agreement ("CSA") dated as of January 1, 2013 by and between Ferrari North America, Inc. and Intelliga Communications, Inc. (together with its authorized subcontractors) and is subject to the provisions thereof.

## 1. Currency

For the purposes of this Agreement all fees stated and payments due will be in U.S. Dollars.

## 2. Payment Schedule

Except where otherwise agreed and stated in writing, Intelliga will be paid for services and developments on each project, sub-project, or Schedule on the basis of fifty percent (50%) at time of approval and/or hire, twenty-five percent (25%) at an agreed project or sub-project milestone or the temporal mid-point of the project or sub-project, and the final twenty five percent (25%) including any and all outstanding expenses upon project or sub-project completion per terms set out on the invoice (generally within thirty (30) days of receipt).

## 3. Additional Work

(a) Should FNA require or desire to retain Intelliga to perform modifications, additions or improvements to developments outside the scope of any other schedule to the CSA or provide other consulting services, FNA shall submit a written proposal or "change order" to Intelliga stating the proposed scope of any Additional Services. Upon receipt of a written proposal for Additional Services, Intelliga shall submit to FNA a detailed cost estimate for the proposed Additional Services. The cost estimate may be quoted on a fixed fee or on a per hour basis.

(b) The hourly rate specified in 3(c) is subject to change upon 30-days' prior written notice.

(c) Intelliga establishes the following minimum hourly fees based on the type of work performed:

| | |
|---|---|
| Client Mandated Partner Time | $400.00/hour |
| Strategic consultancy including Marketing, Strategy, Business, Management, Sponsorship/Activation, and Security or tasks Intelliga deems to be of similar value | $300.00/hour |
| Client-requested Resource Review (whenever client specifies by which officer, employee or subcontractor for one or more Services are to be performed) | $300.00/hour |
| Management of Third Parties (e.g. other providers of services to client), if required by client, Senior Project Management, IT Consulting, Business Analysis, or tasks Intelliga deems to be of similar value | $200.00/hour |
| Project Management, Copy Editing, Technical Troubleshooting, Analytics, Ad-Hoc User Support, Marketing/Media planning or buying, Software Engineering and development (programming), UI Design, Copywriting, Photography, or tasks Intelliga deems to be of similar value | $150.00/hour |
| HTML, Graphical site content, Graphics manipulation, Scanning, Editing, otherwise un-accounted Travel Time, extra-contractual administrative tasks devolved upon Intelliga by client, or tasks Intelliga deems to be of similar value | $120.00/hour |

## 4. Expenses

FNA shall reimburse Intelliga for all reasonable out-of-pocket expenses, including, without limitation, commercial air transportation between Toronto, Ontario and the tri-state area (or such other locations as may be required by FNA), local transportation by taxi or rental car, and reasonable hotel costs as required by FNA for Intelliga to perform the Services.  FNA shall reimburse Intelliga for the use of private cars as provided in the then-current IRS guidelines. FNA shall reimburse Intelliga for such publications as Intelliga deems reasonably necessary to effectively perform the Services.

IN WITNESS WHEREOF the Parties hereto have executed this Schedule A to that certain Consulting Services Agreement by and between the Parties hereto dated as of January 1, 2013.

**FERRARI NORTH AMERICA, INC.**

Name: _____      Signature: _____

Title: _____      Date: _____

Facsimile: _____

Address:    250 Sylvan Avenue, Englewood Cliffs, New Jersey, U.S.A., 07632

**INTELLIGA COMMUNICATIONS, INC.**

Name:    Mark Davidson       Signature: _____

Title:    President       Date: _____

Address:    3184 Ridgeway Drive, Unit #45, Mississauga, Ontario, Canada, L5L 5S7

# Schedule B

## Basic Dealer Extranet and Associated Marketing Communications Project

This Schedule B shall be deemed an integral part of that certain Consulting Services Agreement ("CSA") dated as of January 1, 2013 by and between Ferrari North America, Inc. and Intelliga Communications, Inc. (together with its authorized subcontractors) and is subject to the provisions thereof.

## 1. Extranet License

License for up to 50 dealerships and other locations to use the Reservoir Digital Asset Management System and the Ferrari Dealer Extranet (the "Extranet") with one user per account and one account per user.

## 2. Services To Be Provided

(a) License to use the Reservoir Asset Management System and the Ferrari Dealer Extranet (the "Extranet"). License includes support for technical problems Intelliga deems to be a fault in Intelliga's code when the Extranet software is used as reasonably intended by Intelliga, plus up to the lesser of thirty (30) minutes or two (2) incidents each month of user support as defined by Intelliga.

(b) Intelliga will maintain the Extranet for use by FNA and authorized North, Central and South American Ferrari dealers.

(c) The Extranet, which may include HTML, images, and scripts, will operate on a Web server, operating system, and database server provided by FNA.

(d) Intelliga will create and/or upload for FNA all of the following content and make available to Extranet users:

   (i) Header images

   (ii) Ensure Homepage module contents are displayed correctly ('latest bulletins', 'what's new'); work with FNA employees with upload rights to ensure that their uploaded materials conform to FNA Marketing's guidelines

   (iii) System Messages

   (iv) Homepage modules except when significant coding is required

   (v) New Folders as requested (within current capabilities of the system) when security settings render FNA incapable of establishing such new folders.  FNA retains responsibility for creating new folders in all other circumstances

   (vi) Folder deletion with FNA direction.  FNA will provide direction regarding and effect movement of the contents of folders to be deleted

   (vii) Car Price Calculator data (based on complete price and option data as supplied by FNA no less than 20 business days prior to update)

   (viii) Apply updated dealer zip-assign files provided by FNA to the Extranet

   (ix) Maintain content security as related to user access

   (x) Maintain the organization of dealers, dealer regions and area sales managers within the system, including activating new dealerships and deactivating dealerships, but excluding the addition or deactivation of dealer staff user accounts

   (xi) Evaluate and Process special user account requests (those which are beyond the capabilities of Admin tools provided for FNA by Intelliga); this may include but is not limited to adding new groups to an existing user's account, moving users from group to group and reactivating deactivated users

   (xii) Evaluate and process third party user account requests per Paragraph 5, Section b of the CSA

   (xiii) Provide technical support for system failures to FNA and dealer staff within FNA business hours; provide FNA IT with information to investigate and resolve user issues related to Extranet access not due to system failures

   (xiv) Work with FNA IT for provision of Extranet and Marketing Services on existing IT Hardware

   (xv) Make basic changes to the system – those which do not require recoding - as requested by FNA and if agreed by Intelliga

   (xvi) Update the underlying Reservoir software with the latest Intelliga releases as Intelliga deems fit

   (xvii) The lesser of up to three (3) hours or twelve (12) incidents per month of user support as defined by Intelliga.

(e) Maintenance and tasks associated with the Inventory Survey / Interest List / Wait List / Lead Management.

(f) Intelliga will provide consulting services in support of the annual process of issuing surveys to participants in the Ferrari Driving Experience.  This process typically runs from sometime in May and extends through August, but it

can extend into September.  Hours used in excess of $2,100 (as calculated pursuant to Schedule A of the CSA) of services provided under this Paragraph 1(e) of this Schedule B shall be billed as provided in Schedule A.

## 3.  Project Director and Approval

FNA acknowledges that Intelliga's provision of the Services set forth in Paragraph 1 of this Schedule B shall require cooperation and coordination with FNA.  FNA has heretofore designated Paul Montopoli as the FNA Project Director. FNA may replace the Project Director at any time on not less than five business days' notice to Intelliga.  Additionally, FNA may, from time to time, designate such other persons as FNA may deem reasonable to interface with Intelliga on non-critical matters relating to the Services to be provided under this Schedule B.  Project Director and assistant Project Director (upon Project Director's unavailability) will be responsible for providing timely responses to e-mail and/or telephone queries from Intelliga's staff and approved sub-contractors.  Project Director shall be reasonably available to meet with Intelliga's staff or approved sub-contractors.  Project Director and assistant Project Director shall be responsible to provide materials reasonably required by Intelliga for the performance of the Services set forth in this Schedule B; such materials to be provided in a timely manner and at FNA's sole expense.  Intelliga will be entitled to rely on responses from Project Director, or if Project Director is not available on a timely basis, assistant Project Director.  All deliverables set forth in Paragraph 1 of this Schedule B are subject to approval of FNA as represented by Project Director, or as applicable, assistant Project Director.

## 4.  Compensation

Total compensation for the Services provided pursuant to this Schedule B shall be in the amounts below. As defined below, Maintenance Fees, License Fees and Dealer Access Fees will be payable in full by FNA. Payment shall be made to Intelliga by FNA as follows:

(a)  On January 1, 2013, $51,000.00 became due and payable by FNA to Intelliga for the 2013 license for its employees and authorized dealer staff to use the Reservoir Asset Management System and the Ferrari Dealer Extranet during the 2013 calendar year.  Intelliga reserves the right to terminate licensee access to the Reservoir Asset Management System and the Ferrari Dealer Extranet if such amount is not paid in full by October 1, 2013.  Intelliga will restore licensee access within 24 hours of clearance of the license amount into Intelliga's bank account.  No reduction will be given in respect of the license fee in connection with any such suspension of service.  In addition, Intelliga may charge a late fee in respect of the license fee or any other amount payable hereunder at the rate of 1.0% per month.

The License Fee is based on an anticipated annual usage of between 501 and 600 users at approximately 50 dealership locations and FNA headquarters.  If the number of dealerships is increased or reduced, the License Fee may be increased or reduced, as applicable, to reflect partial years and more or fewer locations as set forth below:

| Number of Locations | Annual License Fee |
| --- | --- |
| Headquarters and up to 5 Third Party Accounts | $28,000 |
| 10 or Fewer Dealerships | $34,000 |
| 11-20 Dealerships | $39,000 |
| 21-30 Dealerships | $43,000 |
| 31-40 Dealerships | $47,000 |
| 41-50 Dealerships | $51,000 |
| 51-60 Dealerships | $55,000 |
| 61-70 Dealerships | $59,000 |
| 81 Dealerships or more | To be determined |

To the extent that the number of dealerships using the Reservoir Asset Management System and the Ferrari Dealer Extranet is reduced by FNA during the 2013 calendar year, Intelliga will partially and proportionately (based on whole calendar months of reduced usage) apply such reduction in the License Fee to FNA's 2014 contract with Intelliga, if any.

(b)  On or prior to October 1, 2013, FNA will pay Intelliga $94,000 for the services outlined in Paragraphs 2(a)-(f) of this Schedule B as performed or to be performed during the months of January through October 2013.  On a

monthly basis commencing on November 1, 2013 FNA will pay Intelliga monthly in advance $9,400.00 for the Services outlined in Paragraphs 2(a)-(f) of this Schedule B as performed after April 2013.

(c) At its own discretion, FNA may choose to pay Intelliga the aggregate amount of $160,000.00 by October 1, 2013 in total remuneration for the services outlined in this Schedule B, assuming no dealerships are added to the system within the term of this Services Agreement.  By making full payment in one lump sum, FNA would realize a savings of $3,800 for 2013.

(d) Specific vendors or other third parties may, upon terms to be mutually agreed between Intelliga and FNA (which terms may include such third party's signing a Non-Disclosure and Non-Compete agreement acceptable to both Intelliga and FNA) be granted access to the Ferrari Dealer Extranet.

The Service Fee set forth in Paragraph 4(b) above is based on an anticipated annual usage of between 501 and 600 users at approximately 50 existing dealership locations and FNA headquarters.  The Service Fee is calculated based on a reasonable degree of turn-over at existing dealer locations and FNA headquarters and on the addition of no more than five new dealership locations per contract year.  FNA shall keep Intelliga informed of all changes to the authorized Ferrari dealers in North America, Central America, and South America.  A dealership will be deemed to have become active for the purposes of inclusion in Extranet billing by Intelliga if it has signed a letter of intent or contract with FNA or its affiliates to become an authorized Ferrari dealer, and/or if it has sold a Ferrari automobile acquired directly through FNA, and/or if two or more of its staff or prospective staff have been provided with access to the Ferrari Dealer Extranet.  If more than five new authorized dealers are added during the term of the CSA, a one time Service Fee shall be assessed for each additional authorized dealer in the amount of $2,000.00.

## 5.  Additional Work and Expenses

Out-of-scope work requested by FNA, including any features that are included in FNA's Requests for Proposal or in any proposal submitted by Intelliga but not specifically included in this Schedule B or reflected on a separate schedule to the CSA, will be billed on a time and materials basis per Schedule A of the CSA, or in such other manner as the Parties may agree.

FNA shall reimburse Intelliga for expenses related to development and maintenance of the Extranet as set forth in Schedule A.

IN WITNESS WHEREOF the Parties hereto have executed this Schedule B to that certain Consulting Services Agreement by and between the Parties hereto dated as of January 1, 2013.

**FERRARI NORTH AMERICA, INC.**

Name: _____     Signature: _____

Title: _____     Date: _____

Facsimile: _____

Address:  250 Sylvan Avenue, Englewood Cliffs, New Jersey, U.S.A., 07632

**INTELLIGA COMMUNICATIONS, INC.**

Name:  Mark Davidson     Signature: _____

Title:  President     Date: _____

Address:  3184 Ridgeway Drive, Unit #45, Mississauga, Ontario, Canada, L5L 5S7

### VERIFICATION OF R. ADAM V. FOX

R. ADAM V. FOX, pursuant to 28 U.S.C. § 1746, verifies as follows:

      1.    I am the Managing Member of Intelliga Communications LLC ("Intelliga USA"), a subcontractor to Plaintiff, Intelliga Communications, Inc. ("Intelliga"). I am fully familiar with the facts and circumstances underlying the present action.

      2.    I have read the foregoing Verified Complaint, dated April 1, 2015 (the "Complaint"), and hereby verify that the contents of the Complaint are true based either on my own knowledge, or my belief that they are true based on the books and records of Intelliga and Intelliga USA, and my communications with persons working for Intelliga or its subcontractors.

      I certify under the penalty of perjury that the foregoing is true and correct.

Dated: Glen Cove, New York
      April 1, 2015

                                              R. Adam V. Fox