NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| INTELLIGA COMMUNICATIONS, INC., : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> FERRARI NORTH AMERICA, INC. AND : <br> ICREON TECH, INC., : <br> Defendants. : | **Civil Action No. 15-2315 (SRC)** <br><br> **OPINION** |

**CHESLER**, District Judge

This matter comes before the Court upon the motion for partial summary judgment filed by Plaintiff Intelliga Communications, Inc. ("Intelliga"), pursuant to Federal Rule of Civil Procedure 56, and for a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65 [Docket No. 18].  Defendants Ferrari North America, Inc. ("Ferrari") and Icreon Tech, Inc. ("Icreon", together with Ferrari, "Defendants") have opposed the motion.  The Court has considered the papers filed by the parties.  For the reasons that follow, the Court will grant in part and deny in part Plaintiff's motion for summary judgment.  The Court will deny the motion for the preliminary injunction.

**I.    BACKGROUND**

This is a breach of contract and misappropriation of intellectual property litigation arising out of Ferrari's failure to pay 2014 service and license fees for using an extranet created by Intelliga; and Ferrari's permission to Icreon, a developer that Ferrari retained to build a

replacement platform, to access and download content from the Intelliga-developed extranet in the course of creating the new system.

From 2005 until 2014, Intelliga has provided Ferrari with a Dealer Extranet, a password-protected digital asset management system used by Ferrari for its business operations. In addition to a database, the extranet included web-accessible applications such as the Car Price Calculator, which allowed dealers to determine the final price of a car based on selected option choices. Intelliga customized the extranet based on its proprietary Reservoir software, and licensed the extranet to Ferrari pursuant to a series of annual Consulting Services Agreements (each, a "CSA").

In 2014, Ferrari decided to terminate Intelliga, citing dissatisfaction with Intelliga's service, primarily Intelliga's alleged failure to assure the security of Ferrari's data. According to Ferrari, security is the main advantage of using an extranet over a publicly-available webpage. When Ferrari informed Intelliga that an October 2013 security audit commissioned by its parent company revealed vulnerabilities that exposed Ferrari's data to potential access by unauthorized users, Ferrari complains that Intelliga did not promptly, or in some cases, at all, fix the flaws. (DSOF ¶¶ 43, 47-52.) Although Intelliga told Ferrari that it would take "a look ASAP," Ferrari alleges that Intelliga provided no substantive response until five months later, in March 2014, and even then, left four of the most serious concerns unresolved. (*Id.*)

Intelliga stands by its response. According to Intelliga, the security audit work requested by Ferrari was not contractually required, but rather fell under a schedule of optional services listed in Schedule A of the CSA. It was nevertheless performed, free of charge, as a favor to a longtime client. Of the four unresolved "critical" issues, Intelliga notes that two did not involve Ferrari, but concerned the websites of its sister company Maserati of North America, which has used Intelliga extranet since 2003, and continues to do so. (PSOF Reply ¶¶ 43, 52.) The rest, Intelliga claims,

2

were not critical. Intelliga states that a hacker exploiting these vulnerabilities would have been limited to learning the web server on which the extranet was housed and the operating system that it used, information that would have remained discoverable even if Intelliga had implemented the suggested repairs. Neither flaw, Intelliga insists, would have permitted unauthorized access to the extranet or any of its data. (*Id.*)

Ferrari claims that the relationship was further strained by Intelliga's delays in sending the annual CSAs, and general unresponsiveness. Breaking with initial practice of forwarding the contracts early in the year for Ferrari to review and sign, Intelliga did not deliver the 2011 and 2012 CSAs until December of those years. (DSOF ¶ 54; PSOF Reply ¶ 54.) Notwithstanding Ferrari's complaints about the inability to see the terms of the agreements until the end of the covered period, Intelliga waited until September to send the 2013 CSA, which Ferrari never signed, and November for 2014.[1] (DSOF ¶¶ 55-58, 64-65; PSOF Reply ¶¶ 55-58, 64-65.) Ferrari did not sign the 2014 agreement or pay the 2014 fees. (PSOF ¶ 10; DSOF ¶¶ 10, 65; PSOF Reply ¶ 65.)

Because of its problems with Intelliga, Ferrari explains that it decided to search for a replacement vendor, retaining Icreon in June 2014. Ferrari allowed Icreon to access the Intelliga extranet and migrate content to the new platform using the account of Sandro Levati, Ferrari's Director of Information Technology, and an account created under the name of "George Harrison." (PSOF ¶¶ 18, 22; DSOF ¶¶ 18, 22, 62.) Although Defendants do not admit to the alleged details of Icreon's activity, Intelliga claims that through these accounts, Icreon reviewed over 2,500 pages on the extranet, and download over 550, including 208 pages of folder files showing the extranet's structure. (PSOF ¶¶ 34, 35.) Ferrari also paid Intelliga $6,500 to retrieve certain data from the

---

[1] Intelliga states that it delivered the contract in December. (PSOF Reply ¶ 65.) Intelliga also asserts that the parties have not signed the CSAs since 2009. (Davidson Decl. ¶¶ 9-10.) Ferrari only admits that the 2013 agreement was unsigned. (Defs.' Br. at 12.) These discrepancies are not material.

3

extranet, although the scope of the permitted access is disputed. Ferrari states that, pursuant to the agreement, Icreon migrated files and metadata pertaining to users (including their contacts, profiles, and roles), assets and asset folders, the data underpinning the Car Price Calculator (car models and their accessories), dealers and their staff, and policy and procedure manuals. (DSOF ¶¶ 66-67.) Intelliga denies that any portion of the Car Price Calculator was part of the allowed data export because the agreement was limited to "documents," whereas the data for the calculator was not stored in a document, but integrated into the application. Intelliga likewise denies that it ever gave Icreon permission to access the extranet, insisting that Icreon had a right to only the data that Intelliga, not Icreon, first moved to another location. (PSOF Reply ¶¶ 66-67; Davidson Decl. ¶ 57; FAVC ¶ 71.)

Intelliga claims that Icreon used Intelliga's intellectual property to create the competing extranet for Ferrari, citing as an example similarities between Icreon's and Intelliga's Car Price Calculators. For instance, Intelliga notes that the way in which Icreon displayed information (such as the order of columns in which options are shown), authored specific text, or designed the administrator interface, mirrored or closely resembled Intelliga's application. (FAVC ¶¶ 93-103.) Having acquired allegedly stolen intellectual property in the course of developing the extranet for Ferrari, Icreon, Intelliga claims, also gained an unfair advantage in competing with Intelliga in the broader market for digital asset management software.

Intelliga regards Reservoir and related content as trade secrets, which it has taken measures to protect, including through confidentiality terms in agreements. The CSA prohibits Ferrari from, *inter alia*, reverse engineering the Intelliga extranet, or granting access to any third party without the prior written consent of Intelliga. (CSA § 5(b).) Individual account holders are similarly obligated to maintain Intelliga's confidential information and barred from attempting to emulate

the system by the End User License Agreement ("User Agreement"), which each person must acknowledge before using the extranet. (User Agreement §§ 3, 5.) Intelliga states that "George Harrison" accepted the terms of the User Agreement from a New York City IP address, attributing the assent to Icreon. (PSOF ¶¶ 27-29.) Ferrari's allowance of Icreon's unauthorized access, according to Intelliga, violated the User Agreement and the CSA.

Defendants emphasize that the material accessed was not Intelliga's intellectual property but Ferrari's because Ferrari used the extranet to store its own confidential documents and data. (DSOF ¶¶ 36, 40, 62-63, 71-72; PSOF Reply ¶ 40.) Ferrari asserts that it controlled the design and layout of the extranet, thus even the organizational structure of the extranet (allegedly revealed in 208 of the 550 downloaded files) was either created by Ferrari or built at its express direction. (DSOF ¶¶ 42, 73, 75; PSOF Reply ¶¶ 42, 73, 75.) Any similarities between the two systems Defendants attribute to the specifications that Ferrari mandated for the construction of both. (*Id.*) Plaintiffs do not allege, and Defendants deny, that any proprietary source code was used or viewed by Icreon in the course of development. (DSOF ¶¶ 63, 76; PSOF Reply ¶¶ 63, 76.) Nor, Defendants claim, would Intelliga's source code have been useful to Icreon in creating a system based on a different and incompatible programming language. (DSOF ¶ 76.)

On November 17, 2015, Intelliga filed a Verified Amended Complaint alleging eleven causes of action, including copyright infringement, misappropriation of trade secrets in violation of the New Jersey Trade Secrets Act, breach of contract, and unjust enrichment, in response to which Ferrari counterclaimed for breach of contract. Intelliga's motion for partial summary judgment seeks a final judgment on Count Four of the Amended Complaint for breach of contract arising out of Ferrari's nonpayment of 2014 fees. Intelliga also moves for findings of liability on Counts Three and Seven, alleging violations of the confidentiality provisions of the 2014 CSA and

User Agreement against Ferrari, and unjust enrichment against Icreon. Intelliga lastly asks for a preliminary injunction to stop Defendants from using or retaining its intellectual property.

**II.  DISCUSSION**

### A. Legal Standard for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (construing the similarly worded Rule 56(c), predecessor to the current summary judgment standard set forth in Rule 56(a)). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991)). In considering a motion for summary judgment, a district court "must view the evidence 'in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). It may not make credibility determinations or engage in

any weighing of the evidence. *Anderson*, 477 U.S. at 255; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (holding same).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish the existence of a genuine issue as to a material fact. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001), overruled on other grounds by *Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs*, 134 S.Ct. 773 (2014). However, the party opposing the motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment").

### B. Breach of Contract – 2014 License and Service Fees

To prevail on a breach of contract claim, Plaintiff must prove (1) the existence of a valid contract, (2) its own performance of contractual duty, (3) defective performance by the defendant in violation of the contract, and (4) damages from the breach. *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007) (citing *Video Pipeline, Inc. v. Buena Vista Entm't, Inc.*, 210 F. Supp. 2d 552, 561 (D. N.J. 2002)). Intelliga demands the payment of 2014 fees and contractual interest. Ferrari denies that the 2014 CSA was a valid agreement because Ferrari never assented to its terms, which it did not know until November 2014, one month before the expiration of the covered period. Alternatively, Ferrari claims that Intelliga's material breach of the CSA in failing to provide a secure system or timely services discharged Ferrari's obligations to pay.

Under New Jersey law, an enforceable contract is created when two parties "agree on essential terms and manifest an intention to be bound by those terms[.]" *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 284 (N.J. 1992)). However, such an agreement does not have to be evidenced by an express written document, but may be manifested by conduct and the surrounding circumstances. *Troy v. Rutgers*, 774 A.2d 476, 482 (N.J. 2001). The legal effect of a contract implied in fact is identical to that of an express contract. W*anaque Borough Sewerage Auth. v. Twp. of W. Milford*, 677 A.2d 747, 752 (N.J. 1996). Although silence rarely evidences assent, acceptance of performance under known terms can create a contractual obligation. *See Weichert*, 608 A.2d at 284-85 (N.J. 1992) (silence operates as acceptance "[w]here an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation."). Parties' past practice and course of dealing can supply the terms of their agreement. *See Hall v. Bd. of Educ.*, 593 A.2d 304, 307 (N.J. 1991); *cf. Luden's Inc. v. Local Union No. 6 of Bakery, Confectionery & Tobacco Workers' Int'l Union of Am.*, 28 F.3d 347, 355-56 (3d Cir. 1994) ("general principles of contract law teach us that when a contract lapses but the parties to the contract continue to act as if they are performing under a contract, the material terms of the prior contract will survive intact unless either one of the parties clearly and manifestly indicates, through words or through conduct, that it no longer wishes to continue to be bound thereby, or both parties mutually intend that the terms not survive.").

Intelliga has provided extranet services to Ferrari for approximately ten years, including in 2014, when Ferrari, despite now disavowing the 2014 contract, used the system. (PSOF ¶ 1; DSOF ¶ 1.) Although each year was subject to a new CSA covering a term from January to December, starting in 2011, Intelliga did not deliver the agreements until the end of the applicable period (December in 2011 and 2012, and September in 2013). (DSOF ¶¶ 54, 58; PSOF Reply ¶¶ 54, 58.)

Like in 2014, the 2013 CSA was not signed. (Davidson Decl. ¶¶ 9-10; Defs.' Br. at 12.) Nevertheless, Ferrari kept using the extranet and accepting the conditions under which it was offered. (PSOF ¶¶ 1, 5; DSOF ¶ 1, 5.) The provision and use of the service without a written agreement, which was not forwarded until the end of the covered year, evidences that the parties equated ongoing performance, not the execution of a writing, with assent to renew the contract for a new term.

The parties' conduct in 2014 followed the same course – Intelliga continued to provide and Ferrari continued to use the extranet. Intelliga thus had every reason to believe that Ferrari would acknowledge the 2014 CSA later that year, as there is no evidence that its terms, although not seen by Ferrari until November, elicited any surprise. Contrastingly, when Ferrari wanted to switch vendors in 2015, it informed Intelliga that it had retained a new provider, further supporting the existence of an understanding that the contractual relationship would carry over into a new year, under a new CSA, unless otherwise indicated. (DSOF ¶ 64.) Given this precedent, the Court finds that the parties formed a binding contract for 2014. Ferrari cannot use the extranet during the 2014 term, and then cite Intelliga's delay in delivering the 2014 CSA or Ferrari's failure to sign the agreement to deny the existence of a 2014 contract. The 2014 CSA is a valid agreement between the parties.

Alternatively, Ferrari argues that Intelliga's breach of the 2014 CSA in failing to maintain content security excused Ferrari's obligation to pay. In the event of a breach by a contracting counterparty, the aggrieved party may terminate the contract or continue with its own performance and sue for damages. *Frank Stamato & Co. v. Borough of Lodi*, 71 A.2d 336, 339 (N.J. 1950) (citing 5 Williston on Contracts (Rev. Ed.) 3749). However, "[u]nder no circumstances may the non-breaching party stop performance and continue to take advantage of the contract's benefits."

9

*Travelodge Hotels, Inc. v. Honeysuckle Enters., Inc.*, 357 F. Supp. 2d 788, 798 (D. N.J. 2005) (quoting *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3d Cir. 1992)). Ferrari's alleged trouble with Intelliga on the issue of extranet security began in October 2013, when Ferrari asked Intelliga to repair security vulnerabilities exposed by the audit, but asserts that Intelliga failed to substantively respond for five months until March, 2014. (DSOF ¶¶ 46-52.) Although Ferrari considers this delay, and Intelliga's failure to address certain issues altogether, to be a breach of the CSA, (Ferrari disputes that the security fixes were optional, as Intelliga claims), Ferrari did not at any time in 2014 terminate the agreement or notify Intelliga of an event of default, but continued to use the extranet. This precludes Ferrari from citing Intelliga's alleged breach to avoid payment.

  Ferrari also has not proven that it suffered damages from Intelliga's delay or failure to address security vulnerabilities. Ferrari offers no evidence that any harmful access resulted from the alleged breach of the 2014 CSA, or that it had to pay another provider to make the repairs that Intelliga did not. Instead, Ferrari attributes the costs of its transition to a new extranet platform to Intelliga's purported contractual failings. Those costs, however, are a direct result of Ferrari's decision to retain a new vendor, not Intelliga's deficiencies or alleged breach. The 2014 CSA covered Intelliga's services through December 2014, at which point Ferrari was free to end its relationship with Intelliga and retain a new provider for the following year. The price of such subsequent services bears no connection to Intelliga's obligations under the 2014 CSA. Although Ferrari characterizes these fees as an expenditure that would have been avoided but for Intelliga's unsatisfactory performance, if Ferrari did not pay Icreon to build a replacement platform, Ferrari would have continued to pay service and license fees to Intelliga. Ferrari has not shown damages stemming from Intelliga's nonperformance.

As the moving party with the burden of proof at trial, Intelliga has presented sufficient evidence in support of its breach of contract claim. Ferrari, in its response, has not offered evidence to raise a genuine dispute of material fact to defeat Intelliga's motion. Intelliga is thus entitled to judgment as a matter of law on Count Four of the Amended Complaint.

### C. Breach of Contract – Confidentiality Provisions of the CSA and User Agreement

Intelliga asks the Court for a finding of liability against Ferrari for permitting Icreon to access the extranet, view and download files, and use Intelliga's intellectual property to build a competing extranet. In so doing, Ferrari, according to Intelliga, violated the confidentiality terms of the CSA and User Agreement, which bar third-party access without Intelliga's written consent and prohibit reverse-engineering or copying the extranet built by Intelliga.[2] Intelliga, however, has not carried its burden to prove that it is entitled to summary judgment. Although Icreon has logged on to the Intelliga-developed extranet and downloaded files without Intelliga's permission,

---

[2] The relevant sections provide:

> During the term of this Agreement and thereafter, [Ferrari] agrees that it will not . . . attempt to copy, emulate or reverse engineer the Ferrari Dealer Extranet or any part thereof or otherwise modify or develop the Ferrari Dealer Extranet or any part thereof and/or market to any third party any digital asset management system. Nor shall [Ferrari], during the term of this Agreement or thereafter, without the prior written consent of Intelliga, transfer to any third party or suffer to be transferred to any third party the Ferrari Dealer Extranet or any part thereof or allow access thereto for any purpose.

2014 CSA § 5(b).

> You acknowledge that access to the [Digital Asset Manager] may provide you with an understanding of the underlying intellectual property related to the DAM (collectively, "Intellectual Property"). You agree that the Intellectual Property is to be considered confidential and proprietary to Intelliga and you shall hold the same in confidence, shall not use the DAM other than for the purposes of your or your employer's business with [Ferrari]. In connection therewith, you agree that you will not attempt to emulate or reverse engineer the DAM or otherwise develop and/or market to any third party any digital asset management system, or any part thereof, including without limitation, any snap-ins (associated web-enabled applications) or tools or administrative tools thereof. You agree that . . . you shall take all reasonable and appropriate measures to safeguard any and all Intellectual Property from disbursement and/or disclosure.

User Agreement § 3.

there can be no liability for breach of contract without a showing that damages were proximately caused by the breach. *Frederico*, 507 F.3d at 203. The parties dispute whether Icreon has taken or copied any intellectual property that belongs to Intelliga, which precludes Intelliga from establishing on summary judgment that any damages ensued from Icreon's unauthorized extranet access.

To support a conclusion that Icreon stole Intelliga's intellectual property, Intelliga cites two types of evidence: evidence showing Icreon's activity on the extranet and similarities between Intelliga's extranet and the platform ultimately created by Icreon. Neither conclusively proves that misappropriation occurred. First, Intelliga provides that Icreon accessed the Intelliga-extranet over 2,500 times and downloaded 550 pages, including "folder views" permitting Icreon to see the structure of the extranet, and contents of the Car Price Calculator application. (PSOF ¶¶ 34-35; FAVC ¶¶ 71.) Icreon's incursions, however, do not indisputably establish that misappropriation occurred. While the extranet contained Intelliga's confidential information, it also housed data belonging to Ferrari. (DSOF ¶¶ 36, 40; PSOF Reply ¶ 40.) Defendants state that Icreon only extracted Ferrari's data. (DSOF ¶¶ 36, 40, 62-63.) The nature of and ownership rights to the material accessed by Icreon is thus a disputed issue of material fact between the parties.

Similarities between the two systems likewise do not automatically show that Icreon copied Intelliga's work because Ferrari exercised control over, (or at least, as Plaintiff characterizes, had input into,) the development of both systems. (DSOF ¶¶ 42, 73; PSOF Reply ¶¶ 42, 73.) To exemplify the resemblance between the two platforms, Intelliga describes the parallels between the two Car Price Calculators, such as: the disclaimers warning that the "Car Price Calculator is intended only as a guide to pricing," are identical; columns displaying option choices appear in the same order; the administrator interfaces, which allow system administrators to create and edit the

calculator inputs, look and function in almost the same manner. (FAVC ¶¶ 93-103.) Defendants, however, attribute any similarities between the modules to the specifications and direction provided by Ferrari. (DSOF ¶¶ 42, 73-75.) Parsing Intelliga's contributions from Ferrari's is not a task that the Court may undertake on summary judgment. Accordingly, Intelliga's motion for a finding of liability on Count Three of the Amended Complaint will be denied.

### D. Unjust Enrichment Against Icreon

Intelliga's claim in quasi-contract against Icreon, alleging that Icreon was unjustly enriched as a result of its unauthorized extranet access, suffers from the same problems as Intelliga's breach of contract claim against Ferrari. "To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (1994). Without undisputed evidence demonstrating what content comprising Intelliga's intellectual property Icreon misappropriated, Intelliga cannot establish on summary judgment that Icreon benefitted in building a competing extranet for Ferrari at Intelliga's expense. Intelliga's motion for summary judgment on its quasi-contract claim against Icreon will be denied.

### E. Preliminary Injunction

Finally, Intelliga seeks a preliminary injunction to prevent Defendants from using or retaining Intelliga's trade secrets. Injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988) (internal citation omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S.

7, 20 (2008).  While all four elements are essential, a court may not grant injunctive relief, "regardless of what the equities seem to require," unless the movant carries its burden of establishing both a likelihood of success and irreparable harm.  *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000).  Intelliga has not made the requisite showing.

Intelliga alleges that it will suffer irreparable harm because Icreon is competing with Intelliga in the market for digital asset management software using Intelliga's trade secrets.  However, Intelliga has not demonstrated that Icreon is likely to use Intelliga's trade secrets to build a comparable extranet for any client other than Ferrari.  Intelliga's sole evidence to the contrary are screenshots from Icreon's website describing the product created for Ferrari.  (Davidson Decl. Ex. F.)  This is not enough to establish "a clear showing" of a "present[]" or "immediate" threat of Icreon's continued use or disclosure of Intelliga's intellectual property.  *Cont'l Group, Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980).  Icreon creates software for a variety of clients in a variety of industries; the fact that Icreon highlighted a past project executed for Ferrari does not mean that Icreon will replicate that work for anyone else.  Icreon claims that the extranet was a one-off project for Ferrari.  (Garg Dec. ¶¶ 20-22.)  Intelliga has not produced proof to contradict this assertion.

As to Ferrari's business, if in the course of litigation, Intelliga shows that Icreon's alleged misconduct advantaged it in in competing with Intelliga for Ferrari's account, Intelliga's loss is compensable by money damages, which can be calculated based on an extensive record of fees that Ferrari has previously paid to Intelliga.  The adequacy of money damages precludes a finding of irreparable harm.  *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801-02 (3d Cir. 1989).

Intelliga's motion also fails because Intelliga has not established what information constituting Intelliga's trade secrets is at stake. Intelliga made no allegations that Icreon used its source code. Whatever else may amount to Intelliga's intellectual property, such as features of the Car Price Calculator to which Intelliga claims ownership rights, is a contested issue between the parties. Accordingly, Intelliga's motion for a preliminary injunction will be denied.

### III.   CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Plaintiff's motion for summary judgment. The Court will grant Plaintiff's motion for summary judgment on Count Four of its First Amended Verified Complaint for breach of contract. The Court will otherwise deny Plaintiff's motion for summary judgment. The Court will also deny Plaintiff's motion for a preliminary injunction. An appropriate Order will be filed.


                                        s/ Stanley R. Chesler
                                        STANLEY R. CHESLER
                                        United States District Judge


Dated:  March 8, 2016